A Juvenile *vs.* Commonwealth (No. 1) & another.[1]

Suffolk. January 9, 1980. — May 5, 1980.

Present: Hennessey, C.J., Braucher, Kaplan, Liacos, & Abrams, JJ.

*Delinquent Child. Jurisdiction,* Delinquent child, Transfer hearing. *Practice, Criminal,* Transfer hearing, Dismissal, Speedy trial. *Supreme Judicial Court,* Superintendence of inferior courts.

This court's supervisory powers under G. L. c. 211, § 3, were properly invoked to review the denial of a defendant's motion to dismiss an indictment under c. 277, § 47A, on the ground that a Juvenile Court's transfer order was based on inadequate subsidiary findings. [555-556]

Where a Juvenile Court judge made insufficient subsidiary findings to support a transfer order with respect to the necessary findings of nonamenability of the defendant to rehabilitation, the Superior Court was directed to request the Juvenile Court to clarify its findings before acting on the defendant's motion to dismiss the indictment under G. L. c. 277, § 47A. [556-563]

Petition filed in the Supreme Judicial Court for the county of Suffolk on July 2, 1979.

The case was reported by *Wilkins,* J.

*Brook K. Baker (Clyde D. Bergstresser* with him) for the plaintiff.

*Daniel C. Mullane,* Assistant District Attorney, for the Commonwealth.

*Roberta Thomas Brown,* Assistant Attorney General, for the Superior Court.

Kaplan, J. A juvenile, as petitioner, on July 2, 1979, applied to a single justice of this court to use the court's supervisory powers, G. L. c. 211, § 3, to stay his trial in the Superior Court, county of Suffolk, set to begin that day, on charges of raping a child under the age of sixteen (G. L.

_____

[1] The Superior Court.

c. 265, § 22A). He contended that the trial would be unlaw-
ful and ultimately futile because of certain infirmities in the
procedure by which his case was ordered transferred from
the Boston Juvenile Court to the Superior Court, to be
handled there as if the petitioner were an adult (G. L.
c. 119, § 61); he contended also that the trial should be
aborted because he had been denied his constitutional right
to a speedy trial. As relief (although not specifically stated
in his application) he sought dismissal of the indictment and
a decision that he was free of any form of prosecution for the
alleged incident of rape. The single justice stayed further
proceedings in the Superior Court and, after the parties had
settled a statement of agreed facts, reserved and reported
the matter to the full court.

From the statement of facts we learn the following. On
May 7, 1976, the petitioner was complained of in the Boston
Juvenile Court for delinquency, in that on May 1, 1976, he
had forced sexual intercourse upon a child under sixteen.[2]
The petitioner was then in the fourteen-to-seventeen year
class — he was sixteen years, five months old, having been
born on December 16, 1959. On motion for transfer to the
Superior Court, the first part of the transfer process — an
inquiry into probable cause — was conducted on June 30,
1976. There was testimony tending to prove that the peti-
tioner on May 1, 1976, had raped the victim, a girl five
years old, at knife-point, and left her bleeding in a hallway.
The special justice found that probable cause existed.

On July 14, 1976, a hearing was held on the question of
transfer. In the interim clinical evaluations of the petition-
er had been made on the justice's order. Received at the
hearing were reports from the court clinic psychiatrist, the
probation department, the Department of Youth Services
(DYS), and the Boston Juvenile Court clinic. The justice
heard from the petitioner's mother, two family friends, and

---

[2] In fact a second complaint issued on July 28, 1976, evidently to make a
proper statement that the petitioner was between the ages of fourteen and
seventeen on the date of the alleged offense.

the director of a METCO program in which the petitioner was participating. Finally there was testimony from the person (and her supervisor) responsible for court liaison with DYS. On July 28, 1976, the justice entered his findings and order, stated to be on clear and convincing evidence, with the findings that "the [petitioner] poses a serious threat to the public" and that he "cannot be rehabilitated within the juvenile justice system." (The text of the findings and order appears herein at n.10 and will be discussed below.)

Accordingly, the juvenile complaint was dismissed and a criminal complaint issued, and on September 13, 1976, the grand jury found an indictment under G. L. c. 265, § 22A, to which, on arraignment November 9, 1976, the petitioner pleaded not guilty. On November 29, 1976, the petitioner moved (with a formal affidavit) in Superior Court to dismiss the indictment under G. L. c. 277, § 47A, on the ground that the "opinion and order" of transfer violated the standards announced in *A Juvenile* v. *Commonwealth*, 370 Mass. 272 (1976).

The motion was not heard until August 9, 1977. On September 8, 1977, a judge of the Superior Court issued his "findings and order" stating that the transfer order had inadequate subsidiary findings, and "remanding" the case to the Boston Juvenile Court for the inclusion of subsidiary findings.

This Superior Court order reached the Boston Juvenile Court but was not acted on. On December 4, 1978, the petitioner filed a second or renewed motion to dismiss the indictment, pointing out that fourteen months had elapsed since the remand. The motion came on before a second Superior Court judge who on December 21, 1978, directed the parties to get in touch with the Juvenile Court special justice who had made the transfer order. The assistant district attorney wrote to the justice on January 12, 1979. That justice on February 14, 1979, issued findings and order similar to those of July 28, 1976, except for an addendum to the sixth subsidiary finding (see n.14 below). More delay occurred because of an omission to send a copy of the Febru-

ary 14 paper to the petitioner's attorney. As soon as the attorney learned of it, he on May 10, 1979, filed in Superior Court a motion to suppress the further finding. He contended that, as the original juvenile complaint was dismissed pursuant to G. L. c. 119, § 61, when the transfer order was made, there was nothing on which a further finding could attach. After hearing on the motion to suppress as well as the two motions to dismiss the indictment, another judge of the Superior Court denied all three motions, and set the trial for July 2, 1979. (It is stipulated that both sides have been ready for trial since August 9, 1977, the date of remand.) The judge declined to report the case to this court pursuant to G. L. c. 278, § 30A (since repealed; see now Mass. R. Crim. P. 34, 378 Mass. 905 [1979]). As noted above, application to the single justice was made on July 2, 1979.

Questions are put to us about the appropriateness of invoking this court's supervisory power in the present circumstances; the correctness of the ruling denying the motions to dismiss the indictments which had attacked the underlying transfer orders; and the claim of deprivation of speedy trial. We shall hold: (1) The case is a proper one for consideration under G. L. c. 211, § 3. (2) Both the original and supplemental findings of the Juvenile Court were insufficient by reason of gross ambiguity to support a transfer order. That court should be given a further opportunity to attempt to correct the findings. (3) Especially in the light of this disposition, the question of speedy trial may be passed over.

1. Short of persuading the judge of the Superior Court to report to an appellate court his denial of the motions to dismiss the indictment, the petitioner had no immediate means in the normal course of getting that order reviewed: it was interlocutory in character, and not within G. L. c. 278, § 28E, which, in the converse situation of an order allowing a motion to dismiss an indictment, grants the Commonwealth a right of appeal. (See also Mass. R. Crim. P. 15 [b] [1], 378 Mass. 883 [1979].) Hence the petitioner's resort to our supervisory power. On the petitioner's view,

he should be spared the expense and anxiety of a trial because a conviction would ultimately have to be upset without further recourse by the Commonwealth against him. That prospect, standing alone, might not suffice to justify an exercise of the § 3 power. Cf. *A Juvenile* v. *Commonwealth*, 375 Mass. 104, 106 (1978); *Commonwealth* v. *Cavanaugh*, 366 Mass. 277, 279 (1974). Here, however, we have a question of proper transfer practice, involving the working relation between two departments of the Trial Court. This calls peculiarly for supervision and settlement by us, and should not await some fortuitous opportunity of report or ordinary appeal. See *A Juvenile* v. *Commonwealth*, 370 Mass. 272, 273 (1976); *County Comm'rs of the County of Bristol* v. *Judges of Probate of the County of Bristol*, 338 Mass. 738 (1959). The single justice thought a § 3 proceeding appropriate (he pointed out that the case raised issues said to be common to other cases involving proceedings against juveniles). We agree.

2. "In a criminal case, any defense or objection based upon defects in the institution of the prosecution or in the complaint or indictment" including "a failure to show jurisdiction in the court or to charge an offense" may be raised by motion under G. L. c. 277, § 47A, and it was under that section that the petitioner made his motion and renewed motion to dismiss the indictment herein.[3] We have the question of the extent to which a judge of the Superior Court (or finally this court) may go behind an indictment valid on its face to reach an antecedent error committed in the proceedings in a Juvenile Court.

It should be accepted that judges of the Superior Court do not sit as appellate tribunals to review de novo the soundness of decisions made by Juvenile Court judges to dismiss

---

[3] Under § 47A the defenses or objections must be raised by motion before trial, otherwise they are waived (subject to relief from waiver), except that a defense or objection based on jurisdiction or failure to state an offense may be noticed by the court at any time.

(We have quoted from the text of the statute as amended through St. 1979, c. 344, § 39. The prior text was similar in substance.)

particular delinquency complaints.[4]   And in the present case the petitioner did not seek by his motions to attack the nature or extent of the proof received by the Juvenile Court in the transfer proceeding.[5]

But it seems not only proper for the Superior Court judges, but obligatory upon them, when a § 47A motion is addressed to the point, to consider whether there has been a material failing in the prescribed steps leading to the issuance of the order of transfer.  (Section 47A, as noted, speaks of "defects in the institution of the prosecution.")  Our cases indicate that this scrutiny is surely in order for procedure at the Juvenile Court level that may be offensive to the Constitution (although we have not found such a "defect" in the cases that have reached us).  See *Stokes* v. *Commonwealth,* 368 Mass. 754, 764, 774-776 (1975) (doctrine of *Breed* v. *Jones*), habeas corpus denied sub nom. *Stokes* v. *Fair,* 581 F.2d 287 (1st Cir. 1978); *Commonwealth* v. *Roberts,* 362 Mass. 357, 369 (1972) (written findings not constitutionally required).  Such scrutiny likewise applies to material error short of the constitutional.  See *Connaughton* v. *District Court of Chelsea,* 371 Mass. 301 (1976) (denial of juvenile's right to bring in stenographer); *A Juvenile, petitioner,* 364 Mass. 531, 538-539, 541 (1974) (failure to afford separate hearing as to dismissal of juvenile complaint, and other procedural difficulties); *Commonwealth* v. *A Juvenile,* 363 Mass. 640 (1973) (combination of procedural actions by judge in Juvenile Court incompatible with "proper administration of criminal justice").  We have indicated that judges

---

[4] However, after transfer and a plea or finding of guilty, it is open to the judge of the Superior Court, in his discretion, in lieu of judgment of conviction and sentence, to adjudicate him a delinquent child if at that time he is under eighteen years of age.  G. L. c. 119, § 83.

[5] Ordinarily a motion to dismiss an indictment does not test the adequacy of the evidence of guilt received by the grand jury (see *Commonwealth* v. *Robinson,* 373 Mass. 591, 592 [1977]), but of course the question of guilt is tried to the petit jury.  Analogy is not quite complete to refusing to test, on like motion, the adequacy of the evidence that led to the decision to treat the defendant as an adult, for that question does not reappear in the trial to the petit jury.

of the Superior Court may deal with such defects by dismissal of indictments — which in some cases could be followed by reinstitution of proceedings in the Juvenile Court, see *A Juvenile* v. *Commonwealth,* 375 Mass. 104 (1978) — or by remittal to the Juvenile Court for correction. See *Connaughton, supra* at 302 (application under G. L. c. 211, § 3, not appropriate because Superior Court could provide any one of a number of remedies, including dismissal of the indictment, or an order for additional proceedings in Juvenile Court); *Commonwealth* v. *A Juvenile, supra,* 363 Mass. at 642 (Superior Court could be applied to, to dismiss indictment). Such defects can also be searched out by us after trial and conviction on the criminal complaint, and we may require reference back to the Juvenile Court for further proceedings. See *A Juvenile, petitioner, supra,* 364 Mass. at 544.

Serious deficiency in the subsidiary findings should count as a faulty step in the process of transfer, examinable as above indicated.[6] A résumé of the present procedure for transfer shows those findings to be of vital significance. By G. L. c. 119, § 61, where a delinquency complaint alleges that a child between the ages of fourteen and seventeen has committed "an offense involving the infliction or threat of serious bodily harm,"[7] the Juvenile Court, after a hearing and finding of probable cause, shall go on to consider evidence of five factors (among others that may be relevant): "(*a*) the seriousness of the alleged offense; (*b*) the child's

---

[6] The precise question has not been decided by us, although cognate questions under analogous statutes in other jurisdictions have been answered affirmatively. See, e.g., *R.J.C.* v. *State,* 520 P.2d 806 (Alas. 1974); *In re Stevenson,* 167 Mont. 220 (1975); *Commonwealth* v. *Greiner,* 479 Pa. 364 (1978).

In *Commonwealth* v. *White (No. 1),* 365 Mass. 301, 306 (1974), we found it unnecessary to deal with the suggestion that an indictment could stand even though there had been a violation (undescribed) of Rule 85A of the Rules of the District Courts (adopted May 7, 1973) about transfer practice. (Rule 208, a purely formal rule, replaced rule 85A on June 1, 1976. The Boston Juvenile Court has not been subject to either rule.)

[7] Or has previously been committed to DYS as a delinquent child and has now committed an offense which would be punishable by imprisonment in the State prison if he were an adult.

family, school and social history, including his court and
juvenile delinquency record, if any; (c) adequate protection
of the public, (d) the nature of any past treatment efforts for
the child, and (e) the likelihood of rehabilitation of the
child." The court may decide to continue to treat the child
as a delinquent. But it may dismiss the juvenile complaint
and issue a criminal complaint if, on "clear and convincing
evidence," it makes a "written finding" that the child "[i]
presents a significant danger to the public as demonstrated
by the nature of the offense charged and the child's past
record of delinquent behavior, if any, and [ii] is not amen-
able to rehabilitation as a juvenile." In the important case
of A Juvenile v. Commonwealth, 370 Mass. 272 (1976), the
court interpreted and supplemented § 61 by "Guidelines for
Transfer Hearings." Id. at 280-283.

We first stressed "the important consequences that result
from a transfer decision" (id. at 281), as shown by compar-
ing juvenile treatment with that accorded an adult for like
misbehavior. We spoke of "the legislative policy underly-
ing our statutes relating to delinquent children" (id.), con-
cluding that "the Legislature intended that noncriminal
treatment is to be favored and that transfer should be ordered
only when warranted by exceptional circumstances" (id. at
281-282), but still leaving the judge with a range of discre-
tion in appraising the factors mentioned in § 61,[8] with "no
specific requirement that [he] weigh these factors in a cer-
tain manner or achieve some predesigned balance." Id. at
282.

More specifically, we said we did not believe a decision to
transfer was proper "when supported by findings which
deal only with the seriousness of the charge and the inade-
quacy of existing juvenile facilities in terms of safeguarding
the public." Id. at 282. "[T]here must also be a finding
that the juvenile cannot be rehabilitated within the present
juvenile structure, or that, in the absence of long-term su-

---

[8] The court also mentioned the then current Rule 85A of the District
Court rules (see note 6 above).

pervision and security, he poses a serious threat to the public
. . . ." *Id.* There must be "subsidiary findings indicating
the basis for this conclusion." *Id.*[9]

In the present case there is no claim that the Juvenile
Court failed to receive evidence about or "consider" the five
factors, and no assault is made on the conclusory statutory
finding about danger to the public. In the arguments all
turns on the question of support for the additional necessary
finding of nonamenability of the present petitioner to reha-
bilitation, and here we are bound to agree with the petition-
er that the findings and order of July 28, 1976,[10] contained
insufficient subsidiary findings. What appeared on the
matter in the findings was ambiguous and seemed to com-
mit the very mistake of resting on the seriousness of the
charge and inadequacy of facilities to safeguard the public
("Their facilities [DYS] are semi-secure, at best").

---

[9] Similarly other courts have insisted on subsidiary findings although
the relevant statutes did not in terms require them. See *P.H.* v. *State*, 504
P.2d 837 (Alas. 1972); *D.H.* v. *State*, 76 Wis. 2d 286 (1977).

[10] The document read thus: "After a full hearing, the Court finds that
there is Probable Cause to believe that the defendant committed the of-
fense of rape on [Jane Doe], age 5, armed with a knife and committed
with force and violence.

"The Court next heard the second part of the transfer hearing and
received evidence and reports from the Boston Juvenile Court Clinic psy-
chiatrist, social service report and psychological testing report of the
Clinic. Evidence was also taken from members of the Department of
Youth Service.

"The Court finds that the defendant poses a serious threat to the public.
"*Subsidiary Findings*:

"1) The defendant has no prior juvenile record.

"2) The defendant is a high school student, born 12/16/59 and lives
with his parents and other siblings. It is a family that is well intact and is
not a significant factor in the Court's determination.

"3) The Court Clinic reports indicate that there is no need for psychiat-
ric recommendations for the subject.

"4) Rape by its very nature is a serious offense. In this case, the rape
was committed on a five-year-old child with force and violence. The vic-
tim was left bleeding. The defendant had a knife. The rape occurred in
a hallway of a building.

"5) The Department of Youth Service had no recommendation in
respect to the defendant. Confinement in any of their facilities would be

As to the crucial question of rehabilitation: There were findings that the petitioner had no prior delinquency record; that he was a high school student living with his parents and siblings in a family that was "well intact"; that the report of the court clinic indicated there was no need for psychiatric recommendations for the petitioner; and that DYS had no recommendation for him. These facts and reports suggested a good prognosis for a first offender (unless, indeed, the reports were to be read as meaning that the agencies were simply baffled by the petitioner's singular incident of assumed misconduct, and were therefore resigned to passing the petitioner to the criminal process).[11] The findings then went on to say that "[c]onfinement in any of their [DYS] facilities would be for four months." This statement (unexplained) might have appeared to go not to rehabilitation but to the question of protection of the public; in its possible bearing on rehabilitation, it suggested that more than four months' confinement was needed for a sound rehabilitative program. There was a further statement that "[t]hey [DYS] offer no treatment for sexual offenders." But the latter two quoted findings were not tied back to, or reconciled with, the earlier affirmative or hopeful indications. The upshot, as we have said, was ambiguity. We should

---

for four months. They offer no treatment for sexual offenders. Their facilities are semi-secure, at best.

"6) Based upon all the foregoing, the Court finds, upon clear and convincing evidence, that the defendant poses a serious threat to the public, based on the nature of the offense and the manner in which it was committed; that the defendant can not be rehabilitated within the juvenile justice system.

"Therefore, the Court finds the defendant should be transferred to the Superior Court for trial as an adult, and so orders."

[11] We may note, without necessarily endorsing, the view that, in general, transfer to adult prosecution should not be ordered for juvenile first offenders. "[A] prior record of adjudicated delinquency involving the infliction or threat of significant bodily injury" would be required by Institute of Judicial Administration/American Bar Association, Juvenile Justice Standards Project: Standards Relating to Transfer Between Courts 2.2C.2; and see commentary at 39-40 (1977). See also Schornhorst, The Waiver of Juvenile Court Jurisdiction: Kent Revisited, 43 Ind. L.J. 583, 593 (1968).

add that while the petitioner's age was given — a year and a half left to the limiting age of eighteen — this time factor was not brought into the assessment.[12]

The judge of the Superior Court in his order of September 8, 1977, "remanding"[13] the case to the Juvenile Court "to include subsidiary findings," did not describe the ground of his discontent, and when, after long delay, the judge of the Juvenile Court responded, it was with an insignificant or repetitious addendum.[14]  In denying the petitioner's second motion to dismiss the indictment, the Superior Court judge overlooked the unrepaired ambiguities in the findings.  Possibly he thought himself faced with a choice between, on the one hand, dismissing the indictment with no chance of reinstitution of proceedings in the Juvenile Court (the petitioner being now more than eighteen years old) or of reindictment (G. L. c. 119, § 74), and, on the other hand, retaining the indictment despite its infirmities — and he chose the latter course.[15]  We do not agree with either extreme and think there is a better, although still an imperfect, alternative as follows: The indictment may remain in place provisionally.  We shall direct the Superior Court to request the Juvenile Court, on the basis of the record already made, to clarify its last findings and order of February 14, 1979, in the light of the "Guidelines" and the present opinion.  The steps are to be carried out promptly.  If it

---

[12] A Juvenile Court retains authority over a delinquent child until he reaches the age of eighteen.  Custody may continue beyond that age if DYS on petition establishes that discharge would be "physically dangerous to the public."  G. L. c. 120, § 17.

[13] Whether or not technically a "remand," the order was in essence a request for further enlightenment to enable the judge to rule justly on the § 47A motion.  As indicated earlier in this point 2 of our opinion, similar remittal has been approved by us, as in *Connaughton* v. *District Court of Chelsea*, 371 Mass. 301, 302 (1976).  The petitioner now objects to the remand but did not do so when the order was made.

[14] This consisted of adding to the sixth subsidiary finding: "and he needs to be confined in a secure setting."

[15] The petitioner was not then suggesting any middle course, nor does he do so here.

should appear from revised findings that a case for transfer was not made, the petitioner will be entitled on motion in the Superior Court to a dismissal of the indictment; if adequate revised findings indicate otherwise, the indictment will stand and the case will proceed to trial.[16]

This is not to be understood as a reinstitution of juvenile proceedings out of time, but as a chance for the Juvenile Court to restate and improve ambiguous findings. There is plenty of precedent for nunc pro tunc reconsideration, even after the child has become adult, to improve a transfer order considered insufficient or to cure other procedural faults in the transfer proceedings. See, e.g., *Kent* v. *United States*, 383 U.S. 541, 566 (1966); *Powell* v. *Hocker*, 453 F.2d 652, 657 (9th Cir. 1971); *Kemplen* v. *Maryland*, 428 F.2d 169, 178 (4th Cir. 1970); *Haziel* v. *United States*, 404 F.2d 1275, 1281-1282 (D.C. Cir. 1968); *State* v. *Gibbs*, 94 Idaho 908, 917 (1972); *Knott* v. *Langlois*, 102 R.I. 517, 529-530 (1967); *Dillenburg* v. *Maxwell*, 70 Wash. 2d 331, 355-356 (1966). Indeed in some of these cases the Juvenile Court has been permitted to receive additional evidence. See *Kent, Kemplen*, and *Powell*, all *supra*.

The lesson that may be taken from the present litigation is that, in the relatively few cases in the Juvenile Courts in which the transfer question arises, the proof should be full, and in the still fewer cases where transfer is ordered, the findings should express the judge's reasons in fair detail and with logical cohesion.

3. The petitioner has argued that if, on the record made to the time supervisory relief was sought, it could properly be held that the case must stand trial, then that trial would have been so long delayed since the parties were ready for trial that it must be considered not "speedy" under *Barker* v. *Wingo*, 407 U.S. 514 (1972); see *Commonwealth* v. *Look*, 379 Mass. 893, 897-903 (1980). The present record on the

---

[16] Subject to the possible survival of a "speedy trial" claim.

The disposition outlined in the text is comparable to that made in *Commonwealth* v. *A Juvenile*, 363 Mass. 640, 642 (1973).

matter of delay is unsatisfactory, particularly as to claims of prejudice arising from alleged increased difficulties in establishing alibi and so forth.   On a superficial view, although there are surely signs of sloth on the part of the government, there is also doubt whether the petitioner was vigilant in pressing his rights. Especially in light of the course the case is now to take, we think we should decline to rule on the issue of speedy trial.

The case is remitted to the county court for the entry of an appropriate judgment in accordance with the directions in point 2 of the opinion.

*So ordered.*