COMMONWEALTH *vs.* ROD MATTHEWS.

Norfolk. November 9, 1989. - January 9, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, O'CONNOR, & GREANEY, JJ.

*Homicide. Jurisdiction*, Delinquent child, Transfer hearing. *Delinquent Child. Practice, Criminal*, Transfer hearing, Findings by judge, Examination of jurors, Instructions to jury, Sentence. *Probable Cause. Insanity. Jury and Jurors. Malice. Evidence*, Sanity. *Mental Impairment.*

The record of a hearing held pursuant to G. L. c. 119, § 61, supported the judge's conclusions that the juvenile defendant, charged with first degree murder, was not amenable to rehabilitation as a juvenile and that transfer of his case to the Superior Court for trial as an adult was warranted. [383-387]

At a juvenile transfer hearing held pursuant to G. L. c. 119, § 61, the judge properly made a determination on the Commonwealth's evidence that there was probable cause to believe the defendant committed the offense (first degree murder) as charged, without considering the question of the defendant's criminal responsibility. [387-388]

The record of the jury impanelment at a murder trial did not support the defendant's contentions on appeal that two jurors were improperly excused or that the panel was not selected from a fair cross-section of the community. [388-389]

At a criminal trial the judge's isolated and unobjected-to use of the term "presumption" in his instructions to the jury on criminal responsibility was not error, in view of the charge in its entirety. [389-392]

At a murder trial the judge properly instructed the jury with respect to the effect of mental impairment on the defendant's ability to deliberately premeditate the acts charged, to intend to commit murder with extreme atrocity or cruelty, or to formulate the specific intent to kill or do grievous bodily harm. [392-394]

A judge of the Superior Court properly declined to exercise discretion under G. L. c. 119, § 83, to vacate a defendant's second degree murder conviction and to adjudicate him a delinquent; nor was an evidentiary hearing required, in the circumstances, on the defendant's motion under Mass. R. Crim. P. 30 (a), requesting such relief. [395-396]

INDICTMENT found and returned in the Superior Court Department on July 29, 1987.

The case was tried before *Roger J. Donahue*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*John T. Burns* for the defendant.

*Stephanie Martin Glennon*, Assistant District Attorney, for the Commonwealth.

*Robert H. Weber & Eileen D. Agnes*, for Child Welfare League of America, Inc., & others, amici curiae, submitted a brief.

ABRAMS, J. Convicted as an adult of murder in the second degree at the age of fifteen, the defendant, Rod Matthews, appeals. The defendant alleges error in (1) the decision to transfer his case to the Superior Court for trial as an adult; (2) the jury empanelment; (3) the jury instructions; and (4) the judge's refusal to vacate the sentence and resentence the defendant as a juvenile pursuant to G. L. c. 119, § 83. We conclude there is no error and affirm his conviction.

We summarize the facts. In the fall of 1986, the defendant, Rod Matthews, and the victim, fourteen year old Shaun Ouillette, were classmates at Canton High School. In late October, 1986, the defendant told two classmates, Robert Peterson and Jonathan Cash, that "[h]e wanted to know what it was like to kill someone." He wrote a note to a teacher stating that he liked to light fires and that he felt like killing people he hated.

Sometime in early November, after initially considering two boys to kill, the defendant told his two friends that he had finally decided to kill Shaun Ouillette. The defendant reasoned that Ouillette "would be easy to get to and he probably would be the least missed . . . [because he] didn't have many friends." The defendant planned to kill Ouillette on November 19, 1986. A snow storm, however, cancelled school that day. The defendant postponed his plan to kill Ouillette until the next day.

On November 20, 1986, the defendant invited Shaun Ouillette to come over to his house following school. After play-

ing pool together, the defendant suggested that they go to the woods and build a fort. The defendant brought along a baseball bat, telling Ouillette he needed to return it to a friend. The victim walked into the woods with the defendant behind him. In an effort to disguise his own steps, the defendant walked by stepping in the footprints Ouillette left in the snow.

In the woods the defendant swung the bat, striking Ouillette on the head with enough force to severely crush the skull. Ouillette fell to his hands and knees, crying out for help. The defendant struck Ouillette several more times on the head, thereby killing him. The defendant then used snow to wipe blood off the bat.

A short time later, still carrying the bat, the defendant walked to Peterson's house and said that he had killed Ouillette. He then took Peterson to see the body. When Peterson asked why he had killed Ouillette, the defendant responded, "Just for the heck of it."

Peterson telephoned Cash and told him the defendant had killed Ouillette. Cash refused to believe him. For several days, the defendant would ask Cash, "Do you believe me?" Cash would say that he did not, and the defendant would ask, "Then where is Shaun?" Days later the defendant and Peterson took Cash to view the body. The defendant warned both not to tell anyone or they might be his next victims.

The police investigation into Ouillette's disappearance increasingly pointed to the defendant. During three separate police interviews, the defendant denied having any knowledge of Ouillette's whereabouts on or after November 20, 1986. In a fourth interview, he admitted that Ouillette had come to his house, but indicated that Ouillette had run away from home. In these interviews, the defendant appeared calm and unconcerned, usually grinning or smiling.

In early December, Cash secretly went back to the site of Ouillette's body. He noted the surroundings, returned home, and sent an anonymous letter to the police, describing the body's location and stating that the defendant had killed

Ouillette. Acting on this tip, investigators found Ouillette's body on December 11.

On December 13, 1986, the defendant, then fourteen years old, was arrested and arraigned in Stoughton District Court, in juvenile session, on a charge of delinquency by reason of the murder of Shaun Ouillette. Between April 24, 1987, and May 27, 1987, probable cause and juvenile transfer hearings were conducted in the District Court, pursuant to G. L. c. 119, § 61 (1988 ed.). The judge found probable cause, dismissed the juvenile complaint, and ordered that the defendant be transferred to the Superior Court Department for arraignment as an adult.

On July 5, 1987, a Norfolk county grand jury returned an indictment charging the defendant with murder in the first degree. After a hearing, the trial judge denied the defendant's motion to dismiss the indictment or, alternatively, to remand the case to the juvenile court. On March 10, 1988, a jury found Matthews guilty of murder in the second degree and, pursuant to G. L. c. 265, § 2 (1988 ed.), the judge sentenced him to imprisonment for life. The defendant appealed. We transferred the defendant's appeal to this court on our own motion.

1. *Decision to transfer.* Prior to trial, the defendant filed a motion to dismiss claiming that he was improperly transferred for trial as an adult under G. L. c. 119, § 61, because (1) neither the subsidiary findings nor the weight of the evidence in the record supports the District Court judge's ultimate conclusion that he is not amenable to rehabilitation as a juvenile; and (2) the judge refused to consider the defense of lack of criminal responsibility at the probable cause hearing. The motion was denied. The defendant asserts that the denial of the motion was error.

a. *Amenability to rehabilitation.* "[A] judge has considerable discretion, within this statutory framework, to determine whether a child should be treated as an adult." *A Juvenile* v. *Commonwealth*, 370 Mass. 272, 282 (1976). In reviewing a motion to dismiss an indictment, a Superior Court judge does not "review de novo the soundness of decisions made by Ju-

venile Court judges" during juvenile proceedings. *A Juvenile*
v. *Commonwealth (No. 1)*, 380 Mass. 552, 556 (1980).
Rather, the Superior Court judge considers "whether there
has been a material failing in the prescribed steps leading to
the issuance of the order of transfer." *Id.* at 557. "Serious
deficiency in the subsidiary findings should count as a faulty
step in the process of transfer, examinable" by a Superior
Court judge on a motion to dismiss the indictment or by this
court after trial and conviction on the criminal complaint. *Id.*
at 558. The Superior Court judge determined that the
District Court judge followed the procedure required by
G. L. c. 119, § 61, and our cases, and made all statutorily
required findings. See *Commonwealth* v. *Hawkesworth*, 405
Mass. 664, 669 (1989).

The District Court judge determined that the defendant
was a fourteen year old juvenile who was charged with mur-
der, "an offense involving the infliction . . . of serious bodily
harm." G. L. c. 119, § 61. The judge held the statutorily
required transfer hearing, where he initially determined that
probable cause existed to believe that the defendant had
committed first degree murder as charged. He then consid-
ered the five statutorily delineated "factors."[1] G. L. c. 119,
§ 61. "[A] judge, having considered all relevant factors in
light of the legislative intent and having made supportive
findings, may legitimately conclude that transfer is war-
ranted." *A Juvenile, supra* at 283. The judge made detailed
written findings concerning each enumerated factor. See *Two
Juveniles* v. *Commonwealth*, 381 Mass. 736, 741-742
(1980). *A Juvenile* v. *Commonwealth (No. 1)*, 380 Mass.
552, 563 (1980).

---

[1]General Laws c. 119, § 61, requires that, if the judge finds probable
cause, he "shall then consider, but shall not be limited to, evidence of the
following factors: (a) the seriousness of the alleged offense; (b) the child's
family, school, and social history, including his court and juvenile delin-
quency record, if any; (c) adequate protection of the public; (d) the nature
of any past treatment efforts for the child; and (e) the likelihood of reha-
bilitation of the child."

The District Court judge concluded that (1) the defendant presented a significant danger to the public, as demonstrated by the nature of the offense charged;[2] and (2) the defendant was not amenable to rehabilitation as a juvenile. G. L. c. 119, § 61. The defendant does not dispute the seriousness of the alleged offense. Rather, he argues that "[t]he transfer findings were unsupported by the weight of the evidence before the court." He asserts that the overwhelming evidence before the District Court judge demonstrated his amenability to rehabilitation and, therefore, he should have been treated as a juvenile. G. L. c. 119, § 61.

Based on the testimony he credited, the District Court judge determined that "there is little or no likelihood of rehabilitation of [the defendant] within the juvenile system due to the length of time treatment would be required and for [the] reason that there are no guarantees or assurances that rehabilitation or a measure thereof could be accomplished."[3] The defendant acknowledges that testimony varied concern-

---

[2] The defendant and amici note that at least one commentator has criticized consideration of a juvenile's "dangerousness" as a highly speculative factor. See Valliere, Transfer of Juvenile Offenders to Adult Courts in Massachusetts: Reevaluating the Rehabilitative Ideal, 20 Suffolk U.L. Rev. 989 (1986). The Legislature, however, has directed that a judge consider protection of the public. Thus, it would be error for a judge to ignore this factor.

[3] The judge based his conclusion, in part, on the following subsidiary findings: "20. That extensive examinations and interviews were conducted by 3 Psychiatrists and a Psychologist who testified - and the Court finds: . . .

"b.  Due to the degree of planning a murder, making a choice of victims and showing no emotion, concern or empathy for the victim or his family lead to belief that Rod Matthews is severely mentally ill.

". . .

"g.  That Rod Matthews presents the highest risk of danger to himself and others, that this risk is not acute but chronic and highly potential.

"h.  That institutionalization is absolutely necessary to control Rod Matthews potential for danger and constant adult supervision is imperative.

"i.  That there are no assurances that Rod Matthews psychiatric illness could be cured but it is within the realm of possibility that he could change or show improvement over many years of

ing the amount of time it would take to accomplish rehabilitation, but argues that "there was no evidence indicating [that his rehabilitation] could not be accomplished while [he] was still a juvenile and in the custody of appropriate state agencies."[4]

The record supports the judge's conclusion. Although expert testimony produced conflicting opinions as to the defendant's amenability to rehabilitation as a juvenile, even the most optimistic prognoses would place the defendant's rehabilitation well into adulthood. That the judge's finding is in "direct conflict" with the defendant's view of the evidence is not error. "The judge was entitled to resolve the conflicting testimony. . . . We do not 'revise a judge's subsidiary findings of fact, where they are warranted by the evidence, or . . . review the weight of the evidence related to the findings. In particular, it is inappropriate to ask us to reverse a judge's findings involving credibility, since he saw the witnesses and we did not.'" *Commonwealth v. Day*, 387 Mass. 915, 919

---

treatment by way of drugs and psychotherapy but always under the closest of supervision in a secure setting.

"j.  That many years as expressed by the Psychiatrist and Psychologist exceeds any period of time during which Rod Matthews could be treated or controlled within the juvenile systems.

". . .

"21.  That the Department of Youth Services period of Correction control over a juvenile would not be sufficient to rehabilitate Rod Matthews and any further control would have to be accomplished by the Department of Mental Health without Correction Department control.

"22.  That due to the length of time necessary to treat Rod Matthews and due to the fact that there is no guarantee or assurance of rehabilitating Rod Matthews during a period of time in excess of that which the juvenile system could be employed, the Court finds that Rod Matthews is not likely to be rehabilitated as a juvenile."

[4]The defendant claims further that the Commonwealth "failed to sustain its burden of proving clearly and convincingly that there is *no* likelihood of rehabilitation." The appropriate statutory standard has to do with *amenability* to rehabilitation and does not require proof that rehabilitation is impossible.

(1983), quoting *Commonwealth* v. *Murphy*, 362 Mass. 542, 550-551 (1972) (Hennessey, J., concurring), and cases cited.

The defendant also asserts that both of the lower court's rulings "were based [on the] assumption that in order for there to be a 'likelihood of rehabilitation,' it must be that such 'Rehabilitation' could be completed while [the defendant] remained a [j]uvenile." The defendant argues that, because "jurisdiction over a [j]uvenile committed for a 'mental illness' can extend far beyond his attaining his majority, the evidence was clear that the defendant was amenable to treatment and the 'time limitation,' i.e. majority of [the] defendant, was an erroneous factor interposed by the [c]ourt."

Our law does provide for the possibility of civil commitment of a delinquent beyond the age of majority. See G. L. c. 119, § 83, and c. 120, §§ 16-20 (1988 ed.). This does not, however, render the transfer decision erroneous. The transfer statute only requires the judge "to focus on the minor's potential for successful treatment *before* the age of majority within existing juvenile facilities." *A Juvenile, supra* at 283 (emphasis supplied). See *Two Juveniles, supra* at 742; *Commonwealth* v. *Hill*, 387 Mass. 619, 622 (1982).

b. *Probable cause and lack of criminal responsibility.* At the probable cause portion of the transfer hearing, the defendant presented evidence of lack of criminal responsibility. He claims the judge erred in refusing to consider this evidence in making the probable cause determination. The defendant notes that in *Commonwealth* v. *Ortiz*, 393 Mass. 523, 534 n.13 (1984), we stated in part that "the judge or magistrate should view the [probable cause] proceeding as if it were a trial." In *Commonwealth* v. *Smith*, 357 Mass. 168 (1970), we held that the defendant's criminal responsibility in a capital case is an issue of fact for a jury. *Id.* at 178. Relying on these cases, the defendant argues that, because the fact finder at a probable cause hearing is the judge, he may consider the question of criminal responsibility in his probable cause determination.

The defendant misconstrues our analogy between a probable cause hearing and a trial. The minimum quantum of evi-

dence required to find probable cause "is somewhat analogous in function to [a judge's] ruling on a motion for a directed verdict at trial as to whether there is sufficient evidence to warrant submission of the case to the jury." *Myers* v. *Commonwealth*, 363 Mass. 843, 850 (1973). Consequently, we have adopted a " 'directed verdict' rule in defining the minimum quantum of credible evidence necessary to support a bind-over determination," *id.*, pursuant to which the judge "should view the proceeding as if it were a trial, and should find probable cause only if the Commonwealth has presented sufficient evidence to send the case to a jury." *Ortiz, supra* at 535 n.14.

Where evidence is sufficient to support a murder conviction, without regard to the defendant's criminal responsibility, directing a verdict of not guilty by reason of insanity "would constitute an unwarranted invasion of the province of the jury." *Commonwealth* v. *Gould*, 380 Mass. 672, 679 (1980). Similarly, a finding of "no probable cause by reason of insanity" would improperly expropriate a jury question.

The judge was required only to find that there was probable cause "to believe that the child has committed the offense or violation as charged." G. L. c. 119, § 61. The judge does not "resolve the issue of the juvenile's guilt or innocence." *A Juvenile* v. *Commonwealth, supra* at 279.

2. *Jury impanelment.* During jury selection, the judge informed prospective jurors that the defendant was then fifteen years old and asked whether that fact would "affect your ability to reach an impartial verdict based on the evidence and the law in this case."[5] The defendant claims that, as a result of this question and the follow-up colloquy, the judge erroneously excused two prospective jurors. Again, the record does not support the defendant's assertion.

The defendant claims that both prospective jurors were "excused simply because they expressed serious sympathy for

---

[5]The defendant filed a "motion for the examination of jurors." He requested in substance that the jurors be asked whether their ability to decide the case fairly and impartially would be affected by the defendant's status as a juvenile.

the juvenile's appearance in the adult court." The record reveals that neither juror expressed any belief as to how juveniles should be treated. One of the prospective jurors unequivocally answered the question affirmatively and the other stated that she did not know whether the defendant's age would affect her impartiality. On further examination, both indicated their inability to decide the case solely on the evidence and were excused. "Where, as here, the judge had the opportunity to observe the prospective juror[s] and to explore the possibility of partiality, we cannot say that he abused his discretion." *Commonwealth* v. *Cameron*, 385 Mass. 660, 668 (1982), citing *Commonwealth* v. *Amazeen*, 375 Mass. 73, 83 (1978).

The defendant claims further that exclusion of the two prospective jurors violated his constitutional right to a random selection of jurors from a fair cross-section of the community by eliminating a distinctive group — suburban parents or caretakers of adolescent children. The defendant fashions a shamefully frivolous argument. Suburban parents or caretakers of adolescent children are not a "distinctive" group from whose exclusion a defendant is constitutionally protected. See *Commonwealth* v. *Soares*, 377 Mass. 461, 488-489, cert. denied, 444 U.S. 881 (1979). Further, the record provides no support for the assertion that the excused panel members were even members of this "group."[6]

3. *Jury instructions.* The defendant argues the judge instructed the jury on criminal responsibility and mental impairment and that the instructions were erroneous. The defendant made no objection at trial to the instructions he now

---

[6]The fallacy of the defendant's argument is apparent from his own brief. He states that "[t]he record does not indicate that [one of the prospective jurors] was the mother, sister, or close relative of any adolescent boy, but the likelihood is that she was." Similarly, he writes that "[t]he record does not show whether [the other juror] was in the same discrete class . . . [b]ut it does not indicate he was not in that group either." The record does show that a suburban father of teenage children who expressed concern for the defendant's young age *was* impaneled.

attacks.[7] In support of his conclusions the defendant "parses the charge and attacks it piecemeal. We, however, view the charge in its entirety since the adequacy of instructions must be determined in light of their over-all impact on the jury." *Commonwealth* v. *Sellon*, 380 Mass. 220, 231-232 (1980). "The test is whether there is a substantial risk of a miscarriage of justice." *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). We turn to the instructions.[8]

a. *Instructions on criminal responsibility.* The judge instructed the jury that, "in determining whether the defendant was sane at the time of the alleged crime, you may consider the fact that a great majority of persons are sane and the resulting probability that any particular person, including the defendant, is sane." The defendant acknowledges that this instruction, which concerned the "presumption of sanity," was proper. See *Commonwealth* v. *Amaral*, 389 Mass. 184, 190 (1983); *Commonwealth* v. *Kostka*, 370 Mass. 516, 530 (1976); *Commonwealth* v. *Costa*, 360 Mass. 177, 186 (1971); *Commonwealth* v. *Clark*, 292 Mass. 409, 415 (1935).

---

[7] We think it telling that experienced defense counsel did not raise this issue at the conclusion of the charge.

[8] In his argument on the instructions, the defendant also claims that the judge made two erroneous evidentiary rulings concerning his mental condition. In discussing these two rulings, the defendant makes no reference to the transcript and he cites no authority. Indeed, he recites as facts matters which do not conform to the transcript. Neither claim is properly before this court. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975); *Commonwealth* v. *Cundriff*, 382 Mass. 137, 150-151 n.22 (1980), cert. denied, 451 U.S. 973 (1981).

We briefly discuss these issues. The defendant argues that the judge erroneously excluded a question regarding the effects of the drug Ritalin. At the bench conference, the judge simply asked that the question be rephrased. The defendant did not rephrase the question and did not ask any further questions along that line of inquiry. The defendant has not shown any error.

The defendant also claims the judge erroneously limited testimony regarding his mental condition to experts. The record reveals that the judge indicated that, in his view, experts might be needed to testify about the side effects that a large amount of a particular drug may have on a particular individual. Evidence was neither offered nor excluded on that basis. Further, that was not the theory of the defendant's case.

The judge continued, stating that "[i]t is for the jury to decide whether you wish to draw that inference. The fact that I am giving you this rule, the rule that there is a presumption that the great majority of persons is sane, does not mean you must adopt it. It is a rule that you may or may not adopt depending on how you view all of the evidence, including the medical evidence given by the psychiatrists or psychologists who testified in this case."

The defendant argues that this instruction characterized the "presumption" of sanity as a rule of law, which "misled the jury into believing it deserved a higher consideration than other evidence, particularly the psychiatric testimony" and which "a reasonable juror could easily have viewed . . . as mandatory . . . and could interpret . . . as a conclusive — direction [*sic*] to find sanity." Nowhere in the charge did the judge characterize the presumption of sanity as a rule of law.

The judge instructed the jury that it was free to accept or reject all or part of the expert testimony. The defendant argues that the instruction on the presumption of sanity, combined with the instruction on expert testimony, creates a "strong probability . . . that the artificial weight given to the presumption in the charge caused . . . the jury to ignore all the expert testimony." The charge clearly informed the jurors that they should review *all* of the evidence, including expert testimony, when deciding whether to draw an inference of sanity. See *Commonwealth* v. *Walker*, 370 Mass. 548, 578 n.22, cert. denied, 429 U.S. 943 (1976). This question of the defendant's criminal responsibility was not made mandatory because the judge informed the jurors that they could accept or reject the testimony of any expert.

In this case, the isolated use of the term "presumption" was not error. Cf. *Commonwealth* v. *Walker, supra* at 578-580. The judge's instructions on the procedural operation of the presumption were proper. See *Kostka, supra* at 526-530. The instructions repeatedly assigned to the Commonwealth the burden of proving criminal responsibility beyond reasonable doubt. The Commonwealth placed no reliance on the presumption of sanity or on any inference of probable sanity.

See *Amaral, supra* at 191; *Commonwealth* v. *Guiliana,* 390 Mass. 464, 469-471 (1983); *Commonwealth* v. *Mutina,* 366 Mass. 810, 811 (1975). Rather, it relied on expert testimony and evidence of the nature and circumstances of the killing, *Commonwealth* v. *Ricard,* 355 Mass. 509, 514-515 (1969), to prove that the defendant was criminally responsible.

We repeat that the word "presumption" should not be used in instructing the jury that they can consider "that the majority of [persons] are sane and the resulting probability that any particular man is sane." *Commonwealth* v. *Costa, supra* at 186. See *Commonwealth* v. *O'Brien,* 377 Mass. 772, 780 (1979); *Commonwealth* v. *Kostka, supra* at 525 n.5; *Commonwealth* v. *Walker, supra* at 578 n.22.

b. *Instructions on mental impairment.* The defendant asserts that, in charging the jury on mental impairment, the judge erroneously limited the jury's consideration of the defendant's mental condition to the day of the killing only. He claims this prevented the jury from considering evidence of any mental impairment that may have existed prior to that day and could have affected his capacity to formulate specific intent or to deliberately premeditate.[9] The defendant misreads the instructions.

The judge properly instructed the jury to consider whether the defendant suffered any mental impairment on the day of the killing and, if so, whether it affected his ability to deliberately premeditate or to intend to commit murder with extreme atrocity or cruelty, or to formulate the specific intent to kill or to do grievous bodily harm. See *Commonwealth* v. *Grey,* 399 Mass. 469, 470-471 (1987). *Commonwealth* v. *Dunton,* 397 Mass. 101, 104 (1986). *Commonwealth* v. *Gould,* 380 Mass. 672, 680-686 (1980). Contrary to the defendant's assertions, the judge instructed the jury that it could "consider the defendant's conduct prior to November

---

[9]The defendant was acquitted of murder in the first degree. Therefore, we need not consider the instructions on deliberate premeditation and extreme atrocity or cruelty. We nevertheless include references to them in our discussion in order to provide the context for the challenged instructions that are before this court.

20, 1986, on that date and subsequent thereto in order to determine whether the defendant had specific criminal intent." He also stated that the jury could "consider [any] long-standing mental illness [that the defendant may have suffered] in ascertaining whether the defendant had sufficient mental capacity to deliberately premeditate the acts charged or intended to kill with extreme cruelty or atrocity."

The defendant also argues that the judge erroneously "instructed generally as to the effect of a mental impairment, omitting completely any instruction as to the effect of mental impairment on the ability to formulate a 'specific intent,' and confining the jury only to (1) premeditation and (2) extreme cruelty and atrocity." The record reveals that the judge explicitly gave the instructions which the defendant now claims were absent.

After giving general instructions on specific criminal intent, the judge told the jury that it could "consider the defendant's mental condition on the day in question [November 20, 1986], and whether he suffered any mental impairment on that particular day and, if so, whether it affected the requisite specific criminal intent which is necessary to the Commonwealth's proof of its case." This comports with our case law. See *Grey, supra* at 470-471; *Dunton, supra* at 104. He continued, stating that "[m]alice . . . may be negated by a failure of the government to prove to a point beyond reasonable doubt that the defendant's specific criminal intent was not impaired by a mental condition he may have suffered on November 20, 1986, keeping in mind that the defendant must have the mental capacity to form a specific criminal intent to kill or do grievous bodily harm in a charge of murder." We have said that, "[w]hile a specific intent to kill satisfi[es] the malice requirement . . . actual intent to kill is not a necessary element of murder in the second degree. . . . An intention to inflict injury on the victim which is not justified on any lawful ground or palliated by the existence of any mitigating circumstances is malicious within the meaning of the law." *Commonwealth* v. *McGuirk*, 376 Mass. 338, 345 (1978), quoting *Commonwealth* v. *Bedrosian*, 247 Mass.

573, 576 (1924). Thus, the instruction on malice was more favorable to the defendant than required.

The defendant next claims the judge gave an erroneous supplemental instruction. At the jury's request, the judge gave a supplemental instruction on the "[d]efinition of not guilty by reason of insanity, stressing the definition of criminal responsibility" and "[t]he relation of mental illness to criminal responsibility." The request itself described these issues as "somewhat intertwined." During the supplemental instructions, the judge stated that, "if the Commonwealth has proven to you to a point beyond reasonable doubt that [the defendant] was criminally responsible at that time, it is entitled to have you discard the issue of criminal responsibility entirely and to concentrate on whether or not the government has proven to you murder in the first degree, murder in the second degree or manslaughter."

The defendant claims that this "left the jury with the final impression that if they were convinced [that he] was criminally responsible, they need not determine the effect on his ability to formulate specific intent as the result of mental impairment." The defendant contends that it was erroneous not to reinstruct on the effect that mental impairment may have on specific intent. "[T]he law does not require repetition of the same thought at each turn." *Commonwealth* v. *McLeod*, 394 Mass. 727, 739, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985), quoting *Commonwealth* v. *Peters*, 372 Mass. 319, 324 (1977). Further, a supplemental instruction on mental impairment would have been unresponsive to the jury's request. See *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 610-611 (1987). Nothing in the supplemental instruction on criminal responsibility altered the earlier charge on the distinct concept of mental impairment. The instructions clearly distinguished between the two concepts. "[I]t must be presumed that in reaching the verdict, the jurors heeded the judge's instructions." *Commonwealth* v. *Fidler*, 377 Mass. 192, 199 (1979). There was no substantial risk of a miscarriage of justice.

4. *Motion for postconviction relief.* Following the defendant's conviction of murder in the second degree, the judge imposed a life sentence, as provided by G. L. c. 265, § 2.[10] The defendant moved for postconviction relief under Mass. R. Crim. P. 30 (a), 378 Mass. 842, 900 (1979), requesting that the judge vacate the sentence and adjudicate him a delinquent juvenile, pursuant to G. L. c. 119, § 83 (1988 ed.). The motion was accompanied by a memorandum in support of the motion for postconviction relief. Neither the motion nor the memorandum contained any reference to new evidence or evidence obtained since the transfer hearing which was not offered at trial.

Section 83 provides, in part, that "the superior court may, in its discretion, and in lieu of a judgment of conviction and sentence, adjudicate such person as a delinquent child, and make such disposition as may be made by a district court or a juvenile court under section fifty-eight." G. L. c. 119, § 83. The judge denied the motion, ruling that he "[did] not have discretion under G. L. c. 119, § 83 where the jury has returned a verdict of murder in the 2nd Degree. See G. L. c. 265, § 2. The only sentence that can be imposed is a life sentence."

We agree with the defendant that § 83 is applicable to the defendant's case. "It would seem clear that these statutes [including G. L. c. 119, § 83,] placed discretion in the Superior Court over the sentencing of the defendant despite the language of G. L. c. 265, § 2." *Commonwealth* v. *A Juvenile,* 364 Mass. 103, 107 (1973). See *D'Urbano* v. *Commonwealth,* 345 Mass. 466, 476 (1963); G. L. c. 119, § 83. The statute gives the Superior Court judge an opportunity to reconsider whether the defendant should be treated as a juvenile in light of the entire trial, as well as the transfer hearing.

At the hearing on the motion, the judge commented that, if he had discretion, he would not exercise it because (1) the

[10]General Laws c. 265, § 2, provides in pertinent part, "[w]hoever is guilty of murder in the second degree shall be punished by imprisonment in the state prison for life."

defendant committed an especially brutal murder; and (2) the defendant displayed an utter lack of remorse for the killing. The reasons stated by the judge are sufficient to indicate that he did not abuse his discretion.

The defendant also claims that G. L. c. 119, § 83, "requires an evidentiary hearing on the issues to be decided by the court." We find no error in denying the defendant's motion for an evidentiary hearing. Nothing in G. L. c. 119, § 83, mandates an evidentiary hearing or undermines the judge's discretion to determine whether an evidentiary hearing is warranted. See Mass. R. Crim. P. 30 (c) (3), 378 Mass. 900 (1979); *Commonwealth v. Stewart*, 383 Mass. 253, 257 (1981). The judge had before him the full record of the juvenile transfer proceedings and had presided over the trial. At the hearing on the rule 30 (a) motion, the judge reiterated his familiarity with the extensive body of psychiatric testimony concerning the defendant. The transfer hearing presented the same issue as the postconviction motion: the defendant's need for psychiatric treatment and the desirability to treat him as a juvenile. The judge did not abuse his discretion in denying an evidentiary hearing on the motion. See *Commonwealth v. Toney*, 385 Mass. 575, 579-582 (1982); *Commonwealth v. Coyne,* 372 Mass. 599, 601 (1977). Cf. *Commonwealth v. DeChristoforo*, 360 Mass. 531, 543 (1971).

*Judgment affirmed.*