COMMONWEALTH *vs.* DEXTER BEATTIE.

No. 89-P-1243.

Essex. June 14, 1990. - October 10, 1990.

Present: FINE, KAPLAN, & GILLERMAN, JJ.

Further appellate review granted, 409 Mass. 1101 (1991).

*Homicide. Attempt. Insanity. Intoxication. Intent. Practice, Criminal*, Instructions to jury. *Evidence*, Relevancy and materiality, Crossexamination.

In an indictment for attempted murder, framed under G. L. c. 265, § 16, the word "strangulation" sufficiently described an overt act. [358]

In view of the weight of the evidence at the trial of an indictment for attempt to murder by strangulation, and the absence of any testimony linking mental disease to specific intent, no substantial risk of a miscarriage of justice resulted from the judge's failure to instruct the jury, in accordance with *Commonweath* v. *Grey*, 399 Mass. 469, 474 (1987), that they could consider the defendant's mental condition wherever the Commonwealth had the burden of proving his specific intent. [358-363]

At the trial of an indictment for attempted murder, the judge's comment on evidence of the defendant's intoxication was not inappropriate [364] nor did the instructions to the jury focus on alcohol intoxication to the exclusion of drugs. [364-365]

At a criminal trial, the judge's instructions to the jury on the issue of insanity, properly construed, did not support the contention that the judge had erroneously required the defendant to establish a "specifically identifiable mental disease or defect" from which he suffered. [365]

At the trial of an indictment for attempted murder by strangulation, the evidence did not warrant an instruction to the jury with respect to heat of passion upon reasonable provocation. [365]

At a criminal trial the judge acted within his discretion in restricting cross-examination of a prosecution witness to exclude certain evidence relating to her hospitalization and psychiatric history. [366-367]

INDICTMENT found and returned in the Superior Court Department on September 21, 1988.

The case was tried before *Peter F. Brady.* J.

*Michael J. Traft* for the defendant.

*Elin H. Graydon,* Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. The defendant was indicted by an Essex County grand jury for the crimes of attempt to murder and assault and battery. See G. L. c. 265, § 16, and G. L. c. 265, § 13A. The victim was the defendant's wife. A jury convicted the defendant of both charges on May 25, 1989 (the conviction of assault and battery was placed on file with the defendant's consent), and a timely notice of appeal was filed.

On appeal the defendant argues that (1) the indictment should be dismissed for failure to allege an overt act; (2) there were errors in the judge's instructions to the jury; and (3) the judge erroneously excluded certain evidence.

The relevant evidence presented to the jury was essentially the following. At the time of the incident, June 5, 1988, the defendant, a Beverly police officer, and his wife, Dale Tucker, had been married for almost six years. For various reasons, their early happiness together eroded, and eventually they separated. The defendant took up with another woman, but still he was not willing to end the marriage. Both he and his wife made various efforts to resolve their marital difficulties, but they were not successful. The defendant became increasingly despondent and consulted a physician who prescribed the drug Xanax for the defendant's depression and insomnia.

On June 5, 1988, the day before their sixth wedding anniversary, the defendant telephoned his wife and asked her to come to his apartment. She agreed. They sat at the kitchen table and talked briefly; she told the defendant that she wanted a divorce. The defendant got up from the table, lunged at his wife, put his hands around her throat and choked her. She was knocked to the floor and quickly lost consciousness. When she awoke she was half way down the stairs outside the apartment. She left the building, found her father, and together they went to the Beverly police. Both eyes were black, there was dried blood on her right ear, her face was swollen, and there were finger marks on her neck.

While the police were looking for the defendant — he was not in his apartment — the victim was photographed and then examined by a physician. Unable to find the defendant, the police obtained a warrant for his arrest, but the defendant had already left for New Hampshire in a car he had rented two days earlier.

The defendant's suicide attempt later the same day failed, and the following day the defendant was involved in an automobile accident in Conway, New Hampshire. The Conway police on the scene placed him under arrest and charged him with operating under the influence of a controlled substance. Spontaneously the defendant asked, "Is my wife still alive?" The arresting officer testified that the defendant cried constantly and said repeatedly that he wanted to die. The New Hampshire criminal charge was not pressed and the defendant was taken to the "County Mental Health Center" for treatment.

Denise Knight, the defendant's girlfriend, testified that in May, 1988, one month before the incident, the defendant told her of his approaching anniversary, that it would be his last, that he was going to kill his wife and then kill himself. The day before the incident the defendant drove Knight to an airport in the rented car. Knight returned from her trip on June 11, after hearing about the incident. Unable to reach the defendant by telephone, she went to the defendant's apartment, broke in, and found in a corner of his bedroom a long billy club, a brick and a rope.

The next day Knight and her mother visited the defendant in the New Hampshire hospital. The defendant told Knight exactly what had happened. He choked the victim until her eyes rolled back, blood came out of her ear, and she was unconscious. Uncertain whether she was dead, he put a pillow over her head to suffocate her. Finally he threw water on her and fled the apartment to New Hampshire. There he tried, but failed, to commit suicide, and he described the automobile accident in which he was involved. He asked Knight to get rid of the pillow he had used because there might be blood on it, and he explained the club, brick, and rope: origi-

nally he had not been sure about how he was going to kill his wife, "so he laid things out."

Following defendant's discharge from the hospital, Knight met with the defendant in his apartment. Again she asked him what happened on June 5, and again "he explained everything in detail, exactly where she was sitting, where he was sitting and what had happened, and he pointed to where she was lying." Additional evidence will be described in the course of our discussion of the claimed errors.

1. *The Indictment.*

The principal indictment charged the defendant with the attempt to murder Dale Tucker by strangulation. The defendant argues that strangulation is not an overt act, see *Commonwealth* v. *Gosselin*, 365 Mass. 116, 121 (1974), and therefore the indictment is defective. The term strangulation, without additional words, sufficiently describes an overt act necessary to support an indictment for attempt to murder.[1] The indictment, therefore, adequately gave notice to the defendant of the overt act — never disputed by him — which constituted the offense of attempt. See *Commonwealth* v. *Burns*, 8 Mass. App. Ct. 194, 197 (1979). We are referred to no authority to the contrary on this point, and we have found none.

2. *Instructions to the Jury.*

a. The defendant claims that the judge erroneously failed to instruct the jury that they consider the effect of the defendant's mental state on his ability to form a specific intent to murder, proof of which is required for the crime of attempt to murder. See *Commonwealth* v. *Hebert*, 373 Mass. 535, 537 (1977); *Commonwealth* v. *Grey*, 399 Mass. 469, 474 (1987). The defendant filed a written request to that effect, but he failed to object when the instruction was not given. See Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979). In

---

[1] The American Heritage Dictionary 1203 (2d College ed. 1976), defines strangulation as "the act of strangling." The verb to strangle is defined as "1.a. To kill by squeezing the throat so as to choke or suffocate; throttle. b. To cut off the oxygen supply of; smother." By formal definition, and by common usage, "strangulation" describes an act, the act of killing by squeezing the throat so as to choke.

an effort to avoid rule 24(b), the defendant says that trial counsel was assured by the judge that the requested instruction would be given.

Assuming — without so deciding — that an assurance given in advance of a charge overrides the plain and purposeful requirements of the rule, compare *Commonwealth* v. *Dunton*, 397 Mass. 101, 102 n.2 (1986) ("judge told defense counsel that the defendant's rights were fully protected"), with *Commonwealth* v. *Preziosi*, 399 Mass. 748, 751 (1987) (the alleged error must be brought to the attention of the judge "in specific terms in order to give the judge an opportunity to rectify the error, if any"), we find no such assurance in this record. At the charge conference the judge told the defendant's counsel that he thought his requests were "fair requests and I think I will give most of them. Not particularly in your language, but certainly I will give most of them, anyway. Just for example . . . I am going to give *Henson* but not in your language."

The reference to "*Henson*" (*Commonwealth* v. *Henson*, 394 Mass. 584 [1985]) does not help the defendant. There the court held that the defendant's intoxication could be considered in deciding whether the Commonwealth had proved the required intent. *Id.* at 593. The *Henson* charge was given by the judge here, as he said he would. The judge's "assurance" that he would give "most of" the defendant's requests suggested that he had not completed his thinking about his charge. It most certainly did not assure counsel that he would have the benefit of all his requests or, indeed, of any particular request. If the judge's response conveyed anything important, it was that counsel should be alert to notice which instructions were given and which were not. Thus, there was no compliance with rule 24(b), and we proceed to consider the issue on the familiar basis of whether there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Bowler*, 407 Mass. 304, 305, 308 (1990). Only a showing of "grave prejudice" requires reversal. *Commonwealth* v. *Prendergast*, 385 Mass. 625, 634 (1982).

The miscarriage of justice standard which we apply here requires us to consider the weight of the evidence as well as the judge's charge to the jury. Dr. Eric Dessain, assistant director of psychology at McLean Hospital, testified for the defendant. The direct examination of Dr. Dessain was limited to the defendant's insanity defense. He said that the defendant had a "mental disease or defect," which meant that the defendant's "thoughts were off . . . he had a thought disorder . . . there was a subtle quality or a pervasive feeling of a thought distortion, that he wouldn't act in his best interest. . . . The medical jargon of a thought disorder is called a delusion, which is, I think, you know — well it is a term that is a little confusing. Delusion means that you are out of the pathway. A delusion is much more subtle than a delirium. Delirium is real bad. Delusion is when the subtle quality of the way you think and act. You say to a person: Look gentlemen, this is not quite right. It is a subtle malformation of your thinking which needs to be addressed. I should say, with all due respect, that it is not easy and not everybody can make a diagnosis." Dr. Dessain was never asked, and he did not describe, the content of the defendant's delusion nor how his delusion affected his conduct on June 5.

When asked by defense counsel whether the mental disease or defect affected the defendant's ability to appreciate the wrongfulness of his actions on June 5, Dr. Dessain testified, "Well, you know, obviously how could anybody really do this if he had all his ability to think without some skewing. There was something not quite right. It is like, I think, to say yes or no to that would be a sign of my oversimplification of the situation." When asked whether the mental disease caused the defendant lack of capacity to conform his actions to the law, Dr. Dessain testified, "I really, from what I have seen, I have to answer yes. Maybe there is other evidence I have not seen. But from what I have seen and my experience in this field, which is every day getting a little bit bigger, you know, I could not really say that this man had the ability to nicely premeditate this sort of action. He probably would have done a much better job." It was not until

late in his cross-examination that Dr. Dessain testified unequivocally he believed that the defendant was unable to conform his conduct to the law on June 5.

In contrast to the frequently vague and often inconclusive opinions offered by Dr. Dessain with regard to the defendant's responsibility for criminal conduct, Dr. Martin Kelly, a forensic psychiatrist of Brigham and Women's Hospital and a witness for the Commonwealth, testified that "there is no evidence, in my view, that he [the defendant] had the kind of mental disease or defect at the time of this act on June 5th which resulted in the lack of capacity to appreciate criminality or wrongfulness or lack of the substantial capacity to conform his conduct to the requirements of the law if he was motivated to do so."

Neither Dr. Dessain nor Dr. Kelly was asked any question by the defendant's counsel bearing on the issue of whether the defendant's mental condition affected his capacity to form the specific intent to murder his wife.

We have previously summarized the testimony of Denise Knight. She provided direct, simple and understandable testimony that the defendant planned to kill his wife and then take flight in the rented car, and that on the date of the incident the defendant, having collected murder weapons in his apartment, invited his wife to meet with him there. The defendant's attempt to strangle his wife was followed by his flight to New Hampshire, see *Commonwealth* v. *Dottin*, 353 Mass. 439, 442 (1968), and the failed suicide. The evidence that the defendant acted purposefully with the specific intent to kill his wife on June 5, overwhelmed the weak and hesitant explanation of the defendant's conduct offered by Dr. Dessain.

The judge's charge to the jury emphasized the burden of the Commonwealth to prove beyond a reasonable doubt that the defendant acted "with the specific intent that death resulted." Most important, the judge defined specific intent in explicitly mental terms: "Specific intent requires a focusing of the mind. A thought process. In this particular case and this particular crime, attempted murder, specific intent is re-

quired." The judge had focused the jury's attention on the subjective or mental quality of the required finding of specific intent, and, in the course of these instructions, the judge went on to instruct the jury that evidence of the defendant's intoxication by "alcohol and/or drugs" could be considered in connection with the defendant's capacity to form the required specific intent to murder.

After a recess the judge returned to the issue of the defendant's mental capacity; he instructed the jury with regard to the "issue of insanity." He pointed out that the Commonwealth had the burden of proving beyond a reasonable doubt that the defendant was responsible for what he did on June 5, and in that respect "the crucial point" was the defendant's mental condition on June 5. The judge then read the *McHoul* charge as it appears in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). Then, further on in the charge, the judge again emphasized that "[a] person is not responsible for criminal conduct if, at the time of the crime charged as a result of mental disease or defect, he lacks substantial capacity to appreciate the criminality of his conduct. Two: A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity to conform his conduct to the requirements of law."

True, there was no charge that expressly tied mental disease to the element of specific intent to murder required for a conviction of attempt to murder. It is also true that the mental defect or disease necessary to support a finding that the defendant lacked substantial capacity to form the specific intent to murder may be of a lower or different order than the defect or disease required to support a *McHoul* defense.[2]

_____

[2] However, the characterization of psychiatric testimony as properly bearing on the issue of specific intent rather than improperly bearing on the unacceptable theory of "diminished capacity," see *Commonwealth* v. *Gould*, 380 Mass. 672, 682 (1980), is inherently problematic. Decisions of the Federal courts have varied as to the admissibility of psychiatric testimony on the issue of capacity that falls short of the Federal version of the *McHoul* standard. Compare *United States* v. *White*, 766 F.2d 22 (1st Cir. 1985) (exclusion of psychiatric testimony regarding defendant's mental

See *Commonwealth* v. *Grey*, 399 Mass. 469, 474 (1987).
Nevertheless, in our view, the jury could not have failed to
understand that the defendant's responsibility for his conduct
on June 5 turned, in part, on his mental condition that day.
The jury concluded that neither drugs nor alcohol deprived
the defendant of the mental capacity to form the specific in-
tent to murder his wife, and they rejected as well the
*McHoul* defense that the defendant should be absolved of all
responsibility for his criminal behavior because of serious in-
capacities resulting from a mental defect or disease. It was
highly unlikely, given the weight of the evidence and the ab-
sence of any testimony linking mental disease to specific in-
tent, that — had a *Grey* charge been given[3] — the jury
would have concluded that a mental disease or defect de-
prived the defendant of the capacity to form the required
specific intent to murder his wife. The jury rejected Dr. Des-
sain's testimony. Knight's testimony gave them a more than
adequate basis for doing so, and Dr. Kelly convincingly ex-
plained that there was no mental disease at work to excuse
the defendant. We conclude that there was no substantial
risk of a miscarriage of justice; a *Grey* charge, had it been
given, would not have materially influenced the jury's ap-
praisal of the evidence that tended strongly, if not over-
whelmingly, to establish that the defendant attempted pur-
posely to murder his wife on June 5. See *Commonwealth* v.
*Freiberg*, 405 Mass. 282, 287 (1989); *Commonwealth* v.
*Bowler*, 407 Mass. 304, 308-310 (1990).

---

state sustained on ground that it was offered to establish a diminished ca-
pacity defense) with *United States* v. *Frisbee*, 623 F. Supp. 1217 (N.D.
Cal. 1985) (psychiatric testimony of defendant's mental state admissible to
show absence of specific intent). See generally *United States* v. *Pohlot*,
827 F.2d 889, 903-906 (3d Cir. 1987) (differentiating mens rea from di-
minished responsibility); Greenberg, Using Psychiatric Testimony to Ne-
gate Mens Rea Under the Insanity Defense Reform Act, 61 Temple
L.Rev. 955 (1988).

[3] A *Grey* charge would be to the effect that the jury could consider the
defendant's mental condition whenever the Commonwealth had the burden
of proving the defendant's specific intent to cause a particular result. See
*Commonwealth* v. *Grey*, *supra* at 474.

The defendant makes additional claims that the judge's instructions to the jury were defective. None of them requires an extended discussion.

b. As agreed in the charge conference, the judge gave the jury *Henson* instructions. See *Commonwealth* v. *Henson*, 394 Mass. at 592-594. That portion of the charge was preceded by the following sentence: "In this particular trial, although there was no particular focusing on it, there has apparently been some evidence, if you so find, that the defendant drank alcohol prior to the acts charged." The defendant objected only to the phrase "no particular focusing on it. . . ."

Quite aside from the fact that the defendant focuses on an isolated phrase, see *Commonwealth* v. *Matthews*, 406 Mass. 380, 391 (1990) ("isolated use of the term 'presumption' was not error"), the judge's shorthand summary was not inaccurate. Other than the defendant's later statements which appeared in the hospital records of the Pembroke Hospital, the only evidence bearing on the defendant's intoxication on June 5 was Knight's testimony that, in response to her direct question to the defendant, he said that, "he had just made himself a gin and tonic and that's when Dale had arrived, and he said he took a Xanax at twelve o'clock like he always did." A Pembroke Hospital admission note of July 15, more than a month after the incident, records the defendant as saying, "He had been drinking that day and abusing Xanax." The judge's comment was not inappropriate, much less prejudicial.

c. So too, the judge did not, contrary to the defendant's claim, focus on alcohol intoxication to the exclusion of drugs. Within the *Henson* charge the judge said, "[I]f you find that the defendant was under the influence of alcohol and/or drugs at the time of the crime, you may consider evidence of the defendant's intoxication, if any, at the time of the crime in deciding whether the Commonwealth has proven specific intent beyond a reasonable doubt." There was no error.

d. The defendant also claims, for the first time on appeal, that the judge erroneously failed to reinstruct the jury, in response to their inquiry, with regard to the effect of voluntary

intoxication on specific intent. This point was covered, adversely to the defendant, in *Commonwealth* v. *Matthews*, 406 Mass. 380, 394 (1990) ("[T]he law does not require repetition of the same thought at each turn"), quoting from *Commonwealth* v. *McLeod*, 394 Mass. 727, 739, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985).

e. For the first time on appeal the defendant argues that the judge's *McHoul* instructions were in error because the judge instructed the jury first to determine whether the Commonwealth had proved beyond a reasonable doubt that the defendant did not have a mental disease or defect, and if the Commonwealth failed to do so, the jury could proceed to the issue of causation. The effect of those instructions, says the defendant, was to require the defendant to establish a "specifically identifiable mental disease or defect." The defendant's argument misconstrues the judge's charge. He instructed that *some* mental disease or defect must be found as a predicate to the application of the *McHoul* tests. Consequently the instructions were correct. See *Commonwealth* v. *Laliberty*, 373 Mass. 238, 241 (1977) (question concerning defendant's ability to appreciate the criminality of his conduct properly excluded where defendant's expert witness previously testified that the defendant had no mental disease or defect at the time of the crime). Moreover, the judge instructed the jury that "you are not confined to the opinion of the psychiatrists. . . ." They were told to consider "all of the testimony, expert and nonexpert, whether the defendant was criminally responsible at the times alleged by the Commonwealth." See *Commonwealth* v. *Gould*, 380 Mass. 672, 679 (1980). More than that was not required.

f. Finally the defendant argues that, in connection with his instructions on malice, the judge should have instructed on heat of passion upon reasonable provocation. See *Commonwealth* v. *Callahan*, 401 Mass. 627, 632 (1988). There was no request for such an instruction, nor did the defendant object to the absence of such an instruction. There was no error. As was said in *Commonwealth* v. *Benjamin*, 369 Mass. 770, 774 (1976), " 'anger at one's wife for not remaining his

wife . . .' is 'not sufficient provocation to reduce a homicide, murder to manslaughter' " (quoting the trial judge).

3. *Exclusion of Evidence.*

The defendant claims that the trial judge erred in excluding evidence of Knight's psychiatric history. It is true that evidence of "mental impairment . . . may be the subject of proper impeachment if it is shown that such factors affect the witness's capacity to perceive, remember, and articulate correctly." *Commonwealth* v. *Caine*, 366 Mass. 366, 369 (1974); *Commonwealth* v. *Perreault*, 13 Mass. App. Ct. 1072, 1075 (1982). However, it is also clear that "the scope of cross-examination, including to what extent the accuracy, veracity, and credibility of a witness may be tested, rests largely in the sound discretion of the judge, not subject to revision unless prejudice is shown." *Commonwealth* v. *Caine*, 366 Mass. at 370, quoting from *Commonwealth* v. *Smith*, 329 Mass. 477, 479 (1952); *Commonwealth* v. *Perreault*, 13 Mass. App. Ct. at 1075.

As noted earlier, Denise Knight, the defendant's girlfriend, testified to her conversation with the defendant in which he described his attempt to strangle his wife as well as his plan to kill her and then himself. On cross-examination, Knight admitted that she had been hospitalized in the past for "emotional and mental problems" and that she had been on medication from time to time. When defense counsel asked how many times Knight had been hospitalized, and whether she had attempted to commit suicide, the prosecutor objected, successfully, to both questions. The judge then called counsel to sidebar and pressed defendant's counsel for "some offer" that would make the answer admissible. Defense counsel's response was inadequate until he offered a letter that Knight wrote in which, according to the defendant's counsel, she admitted to lying because it was easier than telling the truth. The judge then ruled that defense counsel could cross-examine Knight as to those portions of the letter which referred to her lying. The defendant made no objection to this ruling and resumed his cross-examination of Knight. On appeal, however, the defendant argues that Knight's psychiatric

history should have been allowed to cast doubt on her verac-
ity and the reliability of her testimony.

The judge acted well within his discretion. Other than the
portion of the letter which referred to Knight's lying, the de-
fendant made no showing, see *Commonwealth* v. *Caine*, 366
Mass. at 370 n.4, of the relevance of her hospitalization or
psychiatric history to her credibility. *Commonwealth* v. *Per-
reault*, 13 Mass. App. Ct. at 1075. Moreover, the judge per-
mitted defendant's counsel to establish that Knight had been
hospitalized from time to time for mental problems, that she
had been on medication from time to time, and that she had
been hospitalized for emotional difficulties in July of 1988,
after the defendant's incident with his wife. There was no
error.

*Judgment affirmed.*