COMMONWEALTH *vs.* MICHAEL J. EAGLES.

Plymouth. February 7, 1995. - April 4, 1995.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Practice, Criminal,* Admissions and confessions, Presumptions and burden of proof, Capital case. *Evidence,* Admissions and confessions. *Search and Seizure,* Exigent circumstances, Consent. *Identification. Homicide. Malice. Mental Impairment. Felony-Murder Rule.*

At a murder trial there was no error in the judge's denial of the defendant's motion to suppress his statement to police as well as certain physical evidence, where the defendant's voluntary cooperation with the police prior to his arrest did not furnish a basis for suppression. [830-833]

An out-of-court identification of a defendant by a witness made as the defendant voluntarily left certain premises in the company of police officers was not, in the circumstances, impermissibly suggestive. [833-834]

At a murder trial the judge's instructions to the jury on malice, considered as a whole, did not create a substantial risk of a miscarriage of justice. [834-837]

At a murder trial there was no error in the judge's instructions to the jury on their consideration of the issue of the defendant's mental impairment. [837-838]

Evidence at a murder trial did not support an instruction for second-degree felony murder and the defendant was not, therefore, entitled to such an instruction. [838-839]

The court declined to further narrow the application of the felony-murder rule. [839]

INDICTMENTS found and returned in the Superior Court Department on August 25, 1986, and May 27, 1987, respectively.

A pretial motion to suppress evidence was heard by *George N. Hurd, Jr.,* J., and the cases were tried before *Guy Volterra,* J.

*Bruce Ferg* for the defendant.

*Robert C. Thompson*, Assistant District Attorney, for the Commonwealth.

GREANEY, J. The defendant was found guilty of murder in the first degree by reason of extreme atrocity or cruelty and felony-murder[1] and of armed robbery. Represented by new counsel on appeal, he argues error in the denial of his motion to suppress and in the jury instructions on malice, mental impairment, and felony-murder. He also argues that we should abolish the felony-murder doctrine. In the alternative, the defendant urges that we exercise our authority under G. L. c. 278, § 33E (1992 ed.), to reduce the murder verdict to murder in the second degree. We reject the defendant's arguments, and we also find no basis to grant relief under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's convictions.

The background of the case is as follows. The victim, who was seventy-nine years old, lived alone in a trailer in Middleborough. The victim kept cash in his trailer (bills in the amounts of one hundred, fifty, and twenty dollar denominations), an envelope full of one dollar bills, and a beer stein half full of change. The victim also kept a shotgun under his bed.

On the night of July 29, 1986, the defendant and Jeffrey Roberio went to the victim's trailer.[2] The defendant and Roberio were driven part of the way to the trailer by one Paul DeMoranville, Roberio's cousin. Roberio had told DeMoranville earlier that "he was going to break into some guy's house." The defendant was standing next to Roberio when this statement was made.

The victim was found in the afternoon of July 30, on the floor in the living room of his trailer. His television set was

---

[1]The verdict from the jury indicated that they did not find murder in the first degree by deliberate premeditation.

[2]Roberio was tried separately and convicted of murder in the first degree and armed robbery. His appeal is pending before this court.

on and tuned to channel 6.[3] He had been savagely beaten and strangled by a pillowcase which was tightly knotted around his neck. The autopsy revealed, and the medical examiner and a pathologist told the jury, that the victim's spine had been fractured, an elbow had been dislocated, bones in his neck had been fractured and several ribs had been fractured on each side. He had extensive injuries to his entire face, and he also had multiple lacerations on his right hand consistent with defensive wounds. The medical examiner also told the jury that the victim was alive when his injuries were inflicted, and that the cause of death was multiple blunt force injuries and strangulation by ligature.

When the police searched the victim's trailer no money was found anywhere, "not even a dollar." The trailer was in disarray, and there were pools of blood and blood stains throughout the trailer.[4] All of the blood stains were type O blood which was the victim's blood type. A police officer who examined the outside of the trailer discovered that the telephone wires had been pulled out. The beer stein that had contained coins was empty and had Roberio's fingerprint on it. Police investigation eventually disclosed (a) the presence of type O blood on a pair of the defendant's pants[5]; (b) the presence of occult blood on the defendant's hands; (c) the presence of blood on one of the defendant's shirts and his sneakers; (d) hairs found in the victim's left hand which were consistent with the defendant's hair. A footprint found on a pillowcase on the floor of the living room in the trailer came from one of the defendant's sneakers. The defendant was seen after the crimes taking handfuls of change out of his pocket. Roberio had possession of the victim's shotgun and

---

[3]The victim was last seen on July 29, at about 7:45 P.M. by his daughter. The victim told his daughter that he was planning to watch a Red Sox baseball game that night on channel 6.

[4]It could be inferred from evidence pertaining to the location of the blood that the victim had been in each of the rooms where blood was found.

[5]The defendant has type A blood.

tried to hide it, but eventually told DeMoranville that he could not dispose of the gun because it was "hot."

The defendant gave the police a tape recorded statement in which he basically denied any involvement in the crimes. At trial, the defendant testified and contradicted his recorded statement. The defendant claimed that on the afternoon and evening of the crimes, he had consumed a considerable amount of alcohol, taken some "acid," and ingested cocaine. The defendant testified that he did not actually take part in the robbery and murder, but admitted to going to the victim's trailer for the purpose of standing watch while Roberio entered the trailer and took the victim's money. According to the defendant, he acted as a lookout for about twenty minutes, and then went into the trailer. At that point, the defendant observed the victim lying on the floor. He bent over and touched the victim's back and concluded that the man was "still breathing, but he was knocked out like." The defendant testified that he had tried to loosen the ligature around the victim's neck.

The defendant presented the testimony of Dr. Wesley E. Profit, a licensed clinical psychologist and director of forensic services at Bridgewater State Hospital. Dr. Profit indicated that the defendant had "a passive dependent personality disorder with depressive features" and "some sort of learning disability." When asked whether, on the night of the murder, the defendant lacked the substantial capacity to conform his conduct to the law as the result of the consumption of drugs or alcohol, Dr. Profit gave the following response: "My opinion is that [the defendant] lacks that capacity to conform his conduct to the requirements of the law as a result of the specific ingestion of a number of substances on the evening of this event and the fact that he already possesses some difficult [*sic*], some learning disability which would have made it, even had he not been making use of these substances, difficult for him to understand what was going on." Dr. Profit also expressed the opinion that the defendant "could have been a participant in a housebreak and certainly if that had been presented to him as the enterprise which [he and

Roberio] were to engage in . . . he would have accepted that routinely." Dr. Profit concluded that, as the result of the ingestion of drugs and alcohol, the defendant "would not have been thinking beyond the circumstances [as] they presented themselves to him," and thought he was just participating in a housebreak. Dr. Profit indicated that the defendant did not suffer from any major mental illness, but that he was severely depressed and had, perhaps, "a borderline personality disorder."[6]

Dr. Michael S. Annunziata, a forensic psychiatrist, testified in rebuttal for the Commonwealth. He stated that he did not think the defendant was retarded, and, despite his poor education, "seemed fairly quick." Based on his review of records and interviews with the defendant, several of the defendant's acquaintances and police officers who had spoken with the defendant on the morning he was taken to the police station, Dr. Annunziata concluded that the defendant was "able to form the specific intent to commit such a crime as armed robbery or murder," that "he had the capacity to deliberately premeditate murder" and that "he was able to form an opinion to consciously disregard the risk to human life."

The jury's verdicts indicate their essential acceptance of the Commonwealth's theory of the case which was warranted by the evidence.[7] That theory was to the effect that Roberio and the defendant, acting as joint venturers, went to the victim's trailer intending to break in and steal his money. On arriving at the trailer, they discovered that the victim was inside. They proceeded to cut off any chance of help being called by severing the telephone line. Roberio and the defendant then entered the trailer and confronted the victim

---

[6]At a sidebar conference over the significance of some of Dr. Profit's opinions, the defendant's trial counsel stated to the prosecutor and the judge that he was not raising any issue of criminal responsibility but that he was raising an issue as to "diminished capacity."

[7]The trial lasted six days and the jury's deliberations were relatively short, commencing at 12:50 P.M., and concluding with the return of guilty verdicts at 4:40 P.M.

who resisted them forcefully. In the course of robbing the victim, Roberio and the defendant beat him mercilessly, tied a cloth around his neck, and in one fashion or another, brought him from room to room to force him to tell them where he kept his money. When the robbery and assault had been completed, the defendant and Roberio left the victim either dying or dead.

1. *Motion to suppress.* The defendant's trial counsel filed a motion which sought to suppress the defendant's statement to the police, physical evidence taken by the police which belonged to the defendant, and an out-of-court identification of the defendant by DeMoranville. The defendant's trial counsel argued in his memorandum of law that the police had made a "de facto" arrest of the defendant at his residence and were required to furnish him with Miranda warnings prior to questioning him. Since they did not give him Miranda warnings until he reached the station, it was argued that all statements he made, and the seizure of physical evidence, should be suppressed.

A judge (not the trial judge) held an evidentiary hearing on the motion and made findings of fact and rulings of law to support the order denying the motion. The judge's findings may be summarized as follows. After preliminary investigation disclosed to the police that the defendant might have been with Roberio on the night of the murder, Middleborough and State police officers went to 15 Archer Court in Middleborough. This was the residence of one Kenneth Jones with whom the defendant had been living for about one and one-half months. The defendant had no fixed living space or room of his own at the residence. He slept either on a couch in the living room or in a room upstairs and kept his clothes and personal belongings in a cardboard box.

The police arrived at 15 Archer Court at 3:45 A.M. Kenneth Jones gave the police permission to enter, and they woke the defendant and asked him to come to the Middleborough police station. In response to a question by a State trooper, the defendant stated that he owned a red and white baseball-type shirt, and that the shirt was in an upstairs bedroom.

The defendant gave the trooper permission to retrieve the shirt and confirmed to the trooper that no area or room in the house was specifically assigned to him, that he just put his "stuff" anywhere and "slept on the couch or wherever was available."[8] The defendant chose to speak to the police because, he said, he had done nothing wrong and he desired to clear up the matter.

After the defendant had dressed, he was accompanied outside and asked to pause for a moment. This pause was made to allow DeMoranville, who was positioned in a parked police cruiser, the opportunity to identify the defendant as Roberio's companion on the night of the crimes. (DeMoranville had not known the defendant before the night the crimes were committed.)

At the police station, the defendant was furnished his Miranda rights and signed a Miranda warning form. The judge found that the defendant was no stranger to police procedures and had been given Miranda rights on at least four other prior occasions. The defendant then gave the police a tape recorded statement, in question-and-answer format, in which he denied any involvement in the crimes and denied having been at the trailer on the evening of July 29, 1986. After the interview, the police placed the defendant under arrest.

Based on his findings of fact, the judge concluded that Kenneth Jones had given the police consent to go into his home, that, after entry, the presence of the police had not been limited to any one area of the residence, and that the defendant had consented to the police taking his shirt. The judge found full compliance with the requirements of the *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and that the defendant's statement to the police was intelligent and voluntary in all respects.

The defendant's appellate counsel has shifted ground slightly in arguing error in the denial of the motion to sup-

---

[8]Later, the police returned to 15 Archer Court, where Kenneth Jones's wife gave the police a pair of the defendant's sneakers.

press. The argument now made is that the police made an illegal warrantless arrest of the defendant at 15 Archer Court, that the identification by DeMoranville was unduly suggestive, and that all that followed after the alleged wrongful arrest, including police acquisition of physical evidence and the defendant's statement to the police, should have been suppressed as the fruits of the illegal arrest.[9]

"Police may not make a warrantless entry into the home of a third person to arrest a suspect or to search for or seize evidence, absent exigent circumstances or consent." *Commonwealth* v. *Voisine*, 414 Mass. 772, 783 (1993), quoting *Commonwealth* v. *Derosia*, 402 Mass. 284, 286, cert. denied, 488 U.S. 980 (1988). The defendant's connection to the Joneses' residence was tenuous. He had been living there for about six weeks, he slept "anywhere," and he kept all of his possessions in a cardboard box. Up to the time of his arrest, he had not paid any rent. It could be inferred from the testimony at the suppression hearing that the Joneses occupied the premises; Kenneth Jones, therefore, had the legal right to authorize the police to enter the premises. *Commonwealth* v. *Voisine, supra.* Jones gave the police information pointing to the defendant as a participant in the crimes, and accompanied them on their return to his residence. He did not object to their entry. The judge's finding that Jones had consented to the police entering the residence of his family has support in the record.

Moreover, the judge's findings indicate his conclusion that the defendant had not been arrested in the Jones's residence. See *Commonwealth* v. *Gil*, 393 Mass. 204, 214 n.8 (1984); *Commonwealth* v. *Ferrara*, 31 Mass. App. Ct. 648, 654 (1991). The judge found that the defendant voluntarily ac-

---

[9]Our analysis proceeds under the usual standard. We have accepted the motion judge's subsidiary findings of fact because they are supported by the evidence, *Commonwealth* v. *Frazier*, 410 Mass. 235, 239 (1991), and give substantial deference to his ultimate findings. *Commonwealth* v. *MacNeill*, 399 Mass. 71, 76 (1987). We make our own determination of the correctness of the judge's legal rulings. *Commonwealth* v. *Corriveau*, 396 Mass. 319, 326 (1985).

companied the police to the station because, as the judge said (paraphrasing the defendant's testimony at the motion hearing) the defendant's position was that he "had not done anything wrong and wanted to clear up the matter." See *Commonwealth* v. *Corriveau*, 396 Mass. 319, 327 (1985) (person who voluntarily accompanies police to station to answer questions generally not in custody); *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 297 (1992). "[T]here is no arrest unless a reasonable person on the scene would perceive that the defendant[ ] [was] being forcibly detained." *Commonwealth* v. *Parker*, 402 Mass. 333, 339 (1988). The defendant was asked by the police to come to the station. They displayed no weapons, they did not touch the defendant, nor was he placed in handcuffs. See *id.* at 338. The defendant, the judge also found, consented to the police taking his red and white baseball-type shirt. See *Commonwealth* v. *Aguiar*, 370 Mass. 490, 496-497 (1976), and cases cited. He, therefore, adopted throughout an attitude of cooperation with the police. The judge found (and this finding is supported by the testimony at the suppression hearing) that the defendant was not placed under arrest until after he gave his statement to the police. His voluntary cooperation prior to arrest cannot furnish a basis for suppressing his statements or the physical evidence acquired by the police.[10]

The defendant also argues that DeMoranville's out-of-court identification of him should have been suppressed as unduly suggestive. As has been previously noted, DeMoranville had not been acquainted with the defendant

---

[10]We note, on the basis of our responsibility under G. L. c. 278, § 33E (1992 ed.), that the record also refutes a possible contention of custodial interrogation prior to the point at the police station when the defendant was furnished with Miranda warnings. The judge's findings of fact and conclusions of law contain an implicit finding, supported by the record, that the defendant was not in custody before he reached the police station. See *Commonwealth* v. *Gil*, 393 Mass. 204, 214 n.8 (1984). The evidence which supports the conclusion that the defendant was not placed under arrest until after he was questioned, also supports a conclusion that he was not in custody, so as to require Miranda warnings, prior to his arrival at the police station.

prior to the date of the murder. His identification of the defendant at 15 Archer Court was a valuable addition to the officers' fund of information about the crimes which they then had under active investigation. DeMoranville had the opportunity to observe the defendant on the evening of July 29, 1986, and a clear view of the defendant when he left 15 Archer Court in the company of the police officers. He had given a description tallying with the appearance of the defendant. The identification, in the circumstances, was a proper police investigative technique and not impermissibly suggestive.[11] We conclude that the motion to suppress was correctly denied.

2. *Instructions on malice.* The defendant argues that the judge's instructions on malice necessary for murder were too expansive and contained statements which might have led the jury erroneously to find malice. The defendant's trial counsel did not object to the instructions on malice. We consider whether the defendant's present argument presents a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Burke*, 414 Mass. 252, 265 (1993).[12]

In discussing malice, the judge covered the three prongs and appropriately expanded on the third prong to include the objective perspective of a reasonably prudent person in the circumstances known to the defendant. See *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987). The jury were instructed that malice was not present if the killing was the result of human frailty, an unintentional act, or was accidental. The judge repeatedly emphasized that, to be malicious, the killing had to be the result of the defendant's intentional,

---

[11]Furthermore, DeMoranville's out-of-court identification could have had no effect on the verdict. The defendant admitted at trial to being Roberio's companion on the night of the murder. A number of witnesses testified that they saw the defendant with Roberio, either immediately before or after the murder. DeMoranville did not testify to the challenged identification. A police officer's brief mention of the identification was cumulative of evidence already before the jury.

[12]Over the defendant's objection, the judge gave the jury a written version of his instructions on malice which followed quite precisely the charge that he delivered.

purposeful, and deliberate state of mind. The judge's instructions on the use of a dangerous weapon further directed the jury to the appropriate inquiry on malice. In connection with the evidence of intoxication and drug use, and the opinions expressed by Dr. Profit, the jury were instructed on the issue of impairment, as a matter of proof, without objection in the terms set out in the margin.[13] The jury also had complete

[13]The judge told the jury the following:

"Again, it is your duty to determine if the defendant's mental state at the time of the homicide was so substantially impaired through the ingestion of alcohol, drugs or otherwise substantially impaired by a mental defect that it, that the defendant could not form the specific intent to kill or to form the specific intent to do the victim grievous bodily harm or that as a result of such substantial mental impairment the defendant was unable to know the circumstances that a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death or grievous harm would follow the contemplated act.

"I have used the phrase specific intent several times and what I mean by specific intent is the act of concentrating or focusing the mind for some perceptible period of time. It is a conscious act with the determination of the mind to do the act. It is contemplation rather than reflex and it must [precede] the act. For example, we may climb a set of stairs or sit in a chair. We do these acts without contemplation. We do them reflexively without focusing the mind. On the other hand, if we draw a check or if we add a column of figures, we focus the mind on the task. It is this sort of intentional focusing of the mind that the law requires in respect to your finding of specific intent.

"If the jury finds that there was such a substantial and I stress the word substantial, a substantial mental impairment through the ingestion of alcohol, drugs or from a mental defect from which the defendant was suffering, then the required mental state necessary to show malice aforethought would not have been shown by the Commonwealth beyond a reasonable doubt and the defendant would be entitled to the benefit of that doubt by an acquittal."

The judge apparently gave this instruction based on what had been said in *Commonwealth* v. *Grey*, 399 Mass. 469, 470-472 (1987), which was decided about five months before this trial took place. The judge did not have the benefit of subsequent cases such as *Commonwealth* v. *Sama*, 411 Mass. 293, 297-299 (1991); *Commonwealth* v. *Sires*, 413 Mass. 292, 298-301 (1992), and the suggested instruction set out in that case (*id*. at 300-301 & n.8); and *Commonwealth* v. *Delaney*, 418 Mass. 658, 663-668 (1994).

and correct instructions on the Commonwealth's burden of proof.

The defendant's objections to the malice instruction focus on portions of the instruction, considered out of context. The judge commenced the instructions on malice with the frequently stated definition linking malice to a "frame of mind which includes not only anger, hatred and revenge, but also any other unlawful and unjustifiable motive." Several sentences later, after giving a concise definition of malice, the judge added: "If the circumstances attending [the] killing disclose that the death follows from a purposeful, selfish, wrongful mood as distinguished from the frailty of human nature, then there is malice aforethought. It is an intent to inflict injury without legal justification." We agree that language, such as quoted in this paragraph, is not helpful and ought in the future to be omitted. The language is not helpful, for example, because it may focus the jury on the need for proof of some special animosity that the defendant harbored toward the victim, when the relevant inquiry is the defendant's intent to kill or do grievous bodily harm, or the defendant's knowledge of circumstances which would indicate to a reasonably prudent person that the conduct in question would likely cause death; or because it may lead the jury to believe that anger, hatred, revenge or a selfish, wrongful mood is enough to show malice. The term "malice" should be defined by reference to the three prongs described in *Commonwealth* v. *Grey, supra,* with such additional explanation as may be appropriate to the understanding of those concepts.[14]

---

[14]The *Grey* decision, *id.* at 470 n.1, at the point indicated, reads as follows:

"Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm. See *Commonwealth* v. *Puleio*, 394 Mass. 101, 108 (1985). However, proof of such an intent is not required because malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated

When the malice instructions are considered as a whole, see *Commonwealth* v. *Carrion*, 407 Mass. 263, 270 (1990), and the portions to which the defendant points are considered in context, it is apparent that the Commonwealth's burden of proof was not impermissibly lowered. The jury were told that the question of malice depended on the nature of the killing, from which malice might, in appropriate circumstances, be inferred, and on the intent harbored by the defendant. As has been mentioned, the "intent" requirement was repeatedly articulated in terms related to the three prongs of malice. Additionally, "the record shows that the evidence did not raise a substantial issue as to [the presence of] malice." *Commonwealth* v. *Burke, supra* at 265. The medical examiner's testimony left little doubt that the victim's injuries were inflicted with an intent to cause death or grievous bodily harm. The primary thrust of the defense was that, because the defendant was so impaired by consumption of drugs and alcohol or a mental impairment, he "lacked the capacity to premeditate, harbor malice, or commit murder with extreme atrocity or cruelty," and the Commonwealth, as a result, had not met its burden of proof. *Commonwealth* v. *Gould*, 413 Mass. 707, 712 (1992). He received comprehensive and accurate instructions on this point. See note 13, *supra.* Considered in their entirety, and with reference to other instructions that were relevant, any extraneous comments in the malice instructions could not give rise to a substantial likelihood of a miscarriage of justice.

3. *Instructions on mental impairment.* The defendant argues that the use of the word "finds" in the first sentence of the third paragraph of the instruction on the issue of impairment, and the use of the adjective "substantial" in explaining mental impairment, impermissibly shifted the burden of proof to him and misdefined the issue. See note 13, *supra.* The use of the word "finds" occurred in a sentence ending,

act. *Commonwealth* v. *Chance*, 174 Mass. 245, 252 (1899). See *Commonwealth* v. *Starling*, 382 Mass. 423, 428 (1981); *Commonwealth* v. *Swift*, 382 Mass. 78, 83 (1980)."

"then [malice aforethought] would not have been shown by the Commonwealth beyond a reasonable doubt and the defendant would be entitled to the benefit of that doubt by an acquittal." The burden of proof was not shifted. The judge was also correct to instruct the jury that only evidence of a "substantial" mental impairment would warrant the conclusion that the defendant lacked the capacity to premeditate, harbor malice, or commit a murder with extreme atrocity or cruelty. Those cases in which a serious issue has been raised as to mental impairment are cases in which there was evidence of a mental impairment "which either diminished [a defendant's] knowledge of what he was doing or impaired his ability to control his actions." *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 549 (1993). See *Commonwealth* v. *Delaney*, 418 Mass. 658, 660 (1994) (evidence defendant suffered from blackout or flashback due to posttraumatic stress related to military service). Contrast *Commonwealth* v. *Fitzmeyer*, *supra* (evidence defendant suffered from epilepsy and had been prescribed Librium did not raise issue of mental impairment); *Commonwealth* v. *Beattie*, 29 Mass. App. Ct. 355, 358-363 (1990) (testimony defendant suffered from "thought disorder" did not provide basis for jury charge based on *Commonwealth* v. *Grey*, *supra*), *S.C.*, 409 Mass. 458, 459 (1991).

4. *Instructions on felony-murder.* The defendant also argues at some length that the jury instructions on felony-murder were erroneous.[15] He maintains that the jury should have also been told that burglary was not, in all cases, a felony inherently dangerous to human life, and that they could re-

---

[15]The first argument made by the defendant appears to be that, in defining felony-murder, the judge failed to inform the jury that the Commonwealth must prove, beyond a reasonable doubt, that the death which occurred during the commission of the alleged felony was an unjustified homicide. In fact, the judge informed the jury that the first element of felony-murder that must be shown beyond a reasonable doubt was the occurrence of an unlawful killing. He had previously defined the term "unlawful killing," as a killing that was not justified, excused, or accidental, and, in his instructions on felony-murder, referred the jury back to this previous definition. This argument is not supported by the record.

turn a verdict of murder in the second degree based on the defendant's participation in a burglary. He also urges that the felony-murder doctrine be abolished "as being illogical, unduly harsh and unjust in application, and unnecessary."

The defendant's trial attorney objected to the judge's instruction that burglary (breaking and entering of a dwelling) is a felony inherently dangerous to human life. On the basis that the defendant was not charged with burglary, the attorney opposed the judge's suggestion that instructions on burglary should be given.[16] On no rational view of the evidence could the home invasion that occurred in this case have been other than a "life felony," and a prerequisite, therefore, for a conviction of murder in the first degree. See G. L. c. 266, § 14 (1992 ed.). See also *Commonwealth v. Johnson*, 399 Mass. 14, 15-16 (1987). The defendant's strategy at trial was to argue that due to mental impairment exacerbated by substance abuse, he did not comprehend and did not share Roberio's intent to commit either a robbery or a burglary by violent means. The jury were instructed that they could not find the defendant guilty of felony-murder unless they found that he shared Roberio's specific intent to commit the underlying crime. They were instructed as to the possible impact on the Commonwealth's burden of proof of substance abuse and mental impairment on a person's ability to form a specific intent. The defendant was not deprived of a viable theory of defense, or of an instruction on a lesser offense to which he was entitled.

Finally, with respect to the defendant's argument urging abolition of the felony-murder doctrine, we again decline "to narrow the application of the felony-murder rule beyond the limits already set in *Commonwealth* v. *Matchett*, 386 Mass. 492, 501-508 (1982)." *Commonwealth* v. *Hawkesworth*, 405 Mass. 664, 675 (1989).

---

[16]An underlying but uncharged felony may serve as the basis for a felony-murder conviction. See *Commonwealth* v. *Matchett*, 386 Mass. 492, 497-498 & n.7 (1982).

After reviewing the record as to the murder conviction, we conclude that there is no reason to exercise our power under G. L. c. 278, § 33E.

*Judgment affirmed.*