COMMONWEALTH *vs.* SAMUEL CAINES.

No. 94-P-2022.

Essex. September 13, 1996. - December 23, 1996.

Present: WARNER, C.J., ARMSTRONG, & PERRETTA, JJ.

*Practice, Criminal,* Instructions to jury. *Malice. Homicide.*

At the trial of a murder indictment, the judge's use of "frame of mind" language in his instruction on malice, in the context of the instructions as a whole, was not grounds for reversal of the verdict of guilty of second degree murder. [815-816]

At a murder trial, the judge's erroneous instruction concerning the third prong of malice did not create a substantial risk of a miscarriage of justice, where, in light of the evidence of the brutal attack on the victim which created a clear and plain likelihood of death, a rational jury could not have been misled in their finding of malice. [816-817]

At a first degree murder trial, there was no error in the judge's giving a manslaughter instruction to which the defendant was not otherwise entitled, in circumstances in which the defense theory was that the defendant had acted without premeditation and that second degree murder was the correct verdict. [817-819]

This court declined a murder defendant's invitation on appeal to eradicate the third definition of malice from the Commonwealth's jurisprudence. [819-820]

INDICTMENT found and returned in the Superior Court Department on June 23, 1993.

The case was tried before *John L. Murphy, Jr.,* J.

*Hugh W. Samson* for the defendant.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

WARNER, C.J. The defendant was convicted by a Superior Court jury of murder in the second degree. On appeal, he contends that his conviction should be overturned because of two errors in the jury instructions. He argues that the trial judge defined malice incorrectly and that he gave a voluntary manslaughter instruction for which there was insufficient evi-

dence. Finally, he contends that the third definition of malice aforethought, known as third prong malice, should be eradicated from our jurisprudence. We affirm.

*The defendant's confession.* On May 22, 1993, the day after the murder, the defendant walked into the Lynn police station and told the police that he had strangled his "girlfriend." He directed the police to a closet in his apartment where he had put the body of fifteen year old Nicole Ferrier, wrapped in plastic bags and covered with a neatly folded blanket. He then gave a detailed confession, here summarized.

Nicole was the daughter of the defendant's former girlfriend. The teenager and the defendant had continued to maintain a relationship, referring to one another as stepfather and stepdaughter. Nicole had been in the custody of the Department of Social Services (DSS) but frequently ran away from her placements. The Sunday before her death, she arrived at the defendant's apartment and told him that she needed food. She remained there for several days. During this time, she developed a friendship with James Owen, a man living with a roommate in an apartment down the hall from the defendant.

On Friday, May 21, the defendant arrived home from work at about 2:15 A.M. He ate his dinner, then went to Owen's apartment where Nicole was staying that night. He told Owen's roommate to make sure that Nicole returned to DSS the next morning and told Nicole that if she wanted to speak to him before she left she should do so then because he would not be awake in the morning. Nicole went to the defendant's apartment and told him that she was falling in love with Owen and did not want to spend her birthday in DSS custody. Caines insisted that she return to DSS; she cursed and pushed him. They struggled. When Nicole tried to leave the room, the defendant grabbed her arm, took two neckties that were hanging on the door, tied them around her neck into a knot, and strangled her. She went into convulsions, and he tried unsuccessfully to revive her. He then looked for more neckties, intending to strangle himself. He wrote a suicide note and tore it up.[1] Caines further confessed that he had inspected Nicole's body to determine whether she was a virgin,

---

[1]The suicide note stated: "To whom it may concern: This way to go has always been a fantasy of mine. All my life I've been fucked over by women. It [*sic*] time to get even. I won't miss this rotten world, especially this

masturbated on her body, then put seminal fluid on a hairbrush and inserted it into her vagina. Afterwards he wrapped the body in plastic bags, secured the bags with tape, and put the body in his closet. He put the victim's underpants in the trunk of his car along with some soap, so that it would appear that he was going to the laundry.[2]

The defendant told the police that he had had three or four drinks of Bacardi rum and Coca Cola and that he thought he had been drunk, since he would not otherwise have done what he did. The defendant did not testify at trial, and his statement was read in evidence.

*Further evidence presented at trial.* At 5:00 P.M. on Thursday, May 20, Nicole telephoned her DSS caseworker to tell him that she would come to his office the next morning and would return to foster care. She left the defendant a note to that effect.[3] According to James Owen, on that same day Nicole told him that she no longer wanted to see the defendant. Again on that day, the defendant confronted Owen, told him that he wanted Nicole to return to DSS, asked if Nicole was "falling in love" with Owen, and told him not to see her any more. Owen refused.

A psychiatrist testified for the defense. He stated that the defendant would not disclose what he had been thinking at the time of the killing, but that he did say he had been angry over Nicole's disobedience and disrespect and what he viewed as her imminent self-destructive behavior. The psychiatrist characterized the defendant as emotionally repressed, the product of an abusive mother and a poverty stricken childhood, who nevertheless managed to achieve an education and a productive work life. Nicole had become his substitute child. He needed to protect and control her, and to have her respect him. Her refusal to return to her social worker as she had previously agreed to do had enraged him. The psychiatrist

fucked up country. May God have mercy on your soul. See you in hell. Fuck you all. Sam."

[2]The defendant told his psychiatrist that his attempts to clean up had occurred several hours after the murder and that he had dozed off in the interim.

[3]The note stated: "Sam, look, I went to sleep over here. I don't think it's right that you told Jimmy to talk me into staying over there because I'm leaving first thing tomorrow. Sorry-ass excuse to get somewhere. You're never going to get it. No, not this time. Nicole."

concluded that Caines did not suffer from a major mental illness, but that he had lacked the capacity to premeditate at the time of the murder because of an impaired mental state. The defendant's difficult life history, his need to exert paternal control over the victim, and his consumption of alcohol — "greater than one-half of a bottle of rum" — had prevented him from "critically evaluat[ing] or weigh[ing] the pros and cons of carrying out his intention."

The autopsy showed that Nicole had died of asphyxia caused by ligature strangulation. Manual strangulation had occurred as well. There was diffuse subcutaneous hemorrhage in the carotid sheath, muscles deep in the victim's neck. The hemorrhage in this area, which does not always occur in strangulation, indicated that a great deal of force had been applied. Prolonged strangulation had caused the blood vessels of the victim's eyes to develop small hemorrhages, or petechiae. The medical examiner testified that it would have taken approximately four minutes for the petechiae to develop and four to eight minutes for Nicole to die.

*The malice instruction.* The defendant challenges the trial judge's introductory language to his instruction on malice. He linked malice to "a frame of mind which includes not only anger, hatred and revenge, but also every other unlawful or unjustifiable motive."

In *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995), decided some fourteen months after the verdict in this case, "frame of mind" language was disapproved. The court stated that it was "not helpful and ought in the future to be omitted" because it could "focus the jury on the need for proof of some special animosity that the defendant harbored toward the victim, when the relevant inquiry is the defendant's intent to kill or do grievous bodily harm, or the defendant's knowledge of circumstances which would indicate to a reasonably prudent person that the conduct in question would likely cause death; or because it may lead the jury to believe that anger, hatred, revenge or a selfish, wrongful mood is enough to show malice. The term 'malice' should be defined by reference to the three prongs described in *Commonwealth* v. *Grey*, [399 Mass. 469, 470 n.1 (1987)], with such additional ex-

planation as may be appropriate to the understanding of those concepts."[4]

In the context of the judge's instructions as a whole, his "frame of mind" language did not create the pitfalls that troubled the court in *Eagles*. The judge followed that language immediately by the statement that "malice aforethought does not necessarily imply ill will towards the person killed. Any intentional killing of a human being without legal justification or excuse with no extenuating circumstances sufficient in law to reduce the crime to manslaughter is malicious within the meaning of the term . . . ." Identical language was cited with approval in *Commonwealth* v. *Torres*, 420 Mass. 479, 484 n.5 (1995). See *Commonwealth* v. *Morgan*, 422 Mass. 373, 380-382 & 380 n.7 (1996); *Commonwealth* v. *Johnson*, 422 Mass. 420, 428-429 (1996). Compare *Commonwealth* v. *Burke*, 414 Mass. 252, 265 (1993).

As the court directed in *Eagles*, the judge went on to describe the three prongs of malice: "First, an unexcused specific intent to kill. Second, an unexcused specific intent to do grievous bodily harm. And third, an unexcused intent to do an act creating a plain and strong likelihood that death or grievous bodily harm would follow. Malice aforethought may be inferred if in the circumstances known to the defendant a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death or grievous bodily harm would follow from the contemplated act."[5]

The instruction concerning the third prong of malice did, however, contain an error which the defendant neither

---

[4]In *Grey* the court described malice as follows: "Malice aforethought may be shown by proof that the defendant, without justification or excuse, intended to kill the victim or to do the victim grievous bodily harm. However, proof of such an intent is not required because malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." 399 Mass. at 470 n.1 (citations omitted).

[5]The defendant asserts at one point in his brief that the judge defined the third prong of malice as creating a purely objective standard, omitting consideration of the subjective element, which refers to the circumstances known to the defendant. However, as the defendant later acknowledges, the judge instructed the jury to consider both the subjective and objective elements required. See *Commonwealth* v. *Mello*, 420 Mass. 375, 389-390 (1995), citing *Commonwealth* v. *Sama*, 411 Mass. 293, 298 (1991).

objected to nor raised in his brief. This was the statement that the risk of grievous bodily harm was sufficient for purposes of the third prong of malice. "The risk for the purposes of the third prong of malice is that there was a plain and strong likelihood of death." *Commonwealth* v. *Sires*, 413 Mass. 292, 303 n.14 (1992) (citations omitted). Nothing "less than a plain and strong likelihood of death [is] sufficient for proof of the third prong of malice." *Id.* See *Commonwealth* v. *Fuller*, 421 Mass. 400, 412 (1995); *Commonwealth* v. *Morgan*, 422 Mass. at 382. Under the circumstances, however, the error did not create a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Sires*, 413 Mass. at 297.

There is no danger that the instruction may have led the jury to infer third prong malice based on the impermissibly lower standard of grievous bodily harm. Caines strangled Nicole both manually and with a ligature over a period long enough to cause petechiae to develop in the blood vessels of her eyes. Further, he used great force, so as to cause hemorrhaging deep in her neck. A reasonable jury could not fail to recognize that the defendant's brutal attack created a clear and plain likelihood of death. Compare *Commonwealth* v. *Garabedian*, 399 Mass. 304, 316 (1987) (strangling and throwing rocks at the victim's face was "quite 'likely to endanger life' "); *Commonwealth* v. *Fitzmeyer*, 414 Mass. 540, 547-548 (1993) (intentional beating and strangling of elderly victim "involved the kind of risk that could only lead to a finding of malice").

*The voluntary manslaughter instruction.* Voluntary manslaughter was the sole theory of manslaughter on which the jury were instructed.[6] The defendant argues that there was insufficient evidence to support a voluntary manslaughter instruction, and that by so instructing them, the judge foreclosed the jury from considering the defense theory that the crime could be reduced from second degree murder to manslaughter based on "diminished capacity."

It is error to give a manslaughter instruction for which there is no evidence. *Commonwealth* v. *Campbell*, 352 Mass 387, 392 (1967). In these circumstances, however, the volun-

---

[6]"Voluntary 'manslaughter . . . [is] a killing from a sudden transport of passion or heat of blood, upon a reasonable provocation and without malice, or upon sudden combat.' " *Commonwealth* v. *Walden*, 380 Mass. 724, 727 (1980) (citation omitted).

tary manslaughter instruction could not have harmed the defendant because there were no other grounds for reducing his crime from murder to manslaughter.

Contrary to the defendant's claim, his crime could not have been reduced to manslaughter based on diminished capacity. "[T]here is no 'diminished capacity' defense in this Commonwealth." *Commonwealth* v. *Parker*, 420 Mass. 242, 245 n.3 (1995). *Commonwealth* v. *Grey*, 399 Mass. at 470 n.2.[7] The judge correctly refused to give the defendant's requested manslaughter instruction, and there is no specific objection to his ruling on the record. Thus, the issue is not properly before this court. Mass.R.Crim.P. 24(b), 378 Mass. 895 (1979); *Commonwealth* v. *Reid*, 384 Mass. 247, 257-258 (1981). The requested instruction would have had the jury convict the defendant of manslaughter if they did not find him guilty of second degree murder. Such a "theory of manslaughter does not conform to any definition of the crime of involuntary manslaughter that [the Supreme Judicial Court] has endorsed. A killing without malice does not automatically become involuntary manslaughter. The traditional elements of involuntary manslaughter must be shown by evidence that the jury might believe before an instruction on involuntary manslaughter is required." *Commonwealth* v. *Sires*, 413 Mass. at 302-303.

The defendant was not entitled to an involuntary manslaughter instruction on any other basis. "When it is obvious . . . that the risk of physical harm to the victim created a plain and strong likelihood that death will follow, an instruction on involuntary manslaughter is not required." *Commonwealth* v. *Pierce*, 419 Mass. 28, 33 (1994), citing *Commonwealth* v. *Fitzmeyer*, 414 Mass. at 547. In this case, "if there was a risk of harm arising from [strangling Nicole], it was the kind of risk (likelihood of death) that could only lead to a finding of malice." *Commonwealth* v. *Sires*, 413 Mass. at 303.

Finally, the defense theory at trial was not, as the defendant asserts on appeal, that he was entitled to a manslaughter

---

[7]The jury were instructed that they could consider any mental impairment caused by the defendant's ingestion of alcohol on his ability to understand the circumstances in which he acted. See *Commonwealth* v. *Sama*, 411 Mass. at 296-299; *Commonwealth* v. *Trapp*, 423 Mass. 356, 360, cert. denied, 117 S. Ct. 618 (1996).

verdict. The theory was that he had acted without premeditation and that second degree murder was the correct verdict.[8]

Assuming that there was insufficient evidence to merit giving a voluntary manslaughter instruction,[9] the error nevertheless redounded to the defendant's benefit because it allowed the jury to consider the lesser offense of manslaughter, an avenue which would not otherwise have been open to them.

*Eradication of the third prong of malice.* The defendant argues that the third definition of malice, which allows malice to be inferred, is "an anachronism impinging the presumption of innocence and complicating and stalling progress in the law of murder." This definition of malice aforethought should, he contends, be eradicated from our jurisprudence.

Our courts recognize that "malice aforethought" is a technical and confusing term and that our homicide law needs simplification. See *Commonwealth* v. *Madeiros*, 255 Mass. 304, 309 (1926); *Commonwealth* v. *Starling*, 382 Mass. 423, 428-431 (1981); *Commonwealth* v. *Catalina*, 407 Mass. 779, 788 (1990). However, we "decline the defendant's invitation that we overrule more than one hundred years of law by doing away with the 'largely but not . . . totally objective basis on which a jury may infer malice . . . .' " *Commonwealth* v. *Sullivan*, 29 Mass. App. Ct. 93, 99 (1990), quoting from *Com-*

---

[8]The defense counsel's opening statement ended with the exhortation: "You will conclude . . . that [Caines] is a tragic, pathetic figure and he will go away for murder, but I will ask you to find a verdict of second degree murder because it is the right verdict." The defense's closing statement began, "I have been conceding to you second degree murder. . . . [W]hile this case is second degree murder, it is a lot closer to manslaughter than it is to first degree murder." The statement ended with the assertion that the defendant did not "cooly deliberate the murder" and a request that the jury return a verdict of "second degree murder at the most and to [*sic*] think about manslaughter." At a bench conference to discuss jury instructions, the defendant's counsel stated, "Frankly, [j]udge, clearly, the jury hasn't been hearing me if they come back [with] manslaughter. I have been pretty well conceding it."

[9]See *Commonwealth* v. *Schnopps*, 383 Mass. 178, 179-182 (1981) (A voluntary manslaughter instruction was required where the defendant claimed that he went "berserk" and shot his wife upon her admission of adultery). Compare *Commonwealth* v. *Rembiszewski*, 363 Mass. 311, 321 (1973) (scratches made by the victim on the defendant's face could not "serve as provocation for a malice-free but ferocious attack by the defendant with a deadly instrument"); *Commonwealth* v. *Pierce*, 419 Mass. 28, 32 (1994) (victim's homosexual advances did not constitute provocation warranting a voluntary manslaughter instruction).

*monwealth* v. *Grey,* 399 Mass. at 472 n.4. Cf. *Burke* v. *Tootha-cre,* 1 Mass. App. Ct. 234, 239 (1973). See *Commonwealth* v. *Starling, supra* at 428.

*Judgment affirmed.*