## COMMONWEALTH *vs.* GEORGE JOHNSON, JR.

Hampden. December 1, 1997. - February 5, 1998.

Present: WILKINS, C.J., LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Homicide. Self-Defense. Practice, Criminal,* Instructions to jury, Empanelment of jury, Jury and jurors, Capital case. *Evidence,* Presumptions and burden of proof. *Malice. Jury and Jurors. Constitutional Law,* Double jeopardy.

At a murder trial, there was no substantial likelihood of a miscarriage of justice arising from the judge's instructions on self-defense or on the Commonwealth's burden of proof, considering the charge as a whole. [620-621]

At a murder trial in which evidence of the defendant's intent to kill was strong and the judge's instructions, read as a whole, explained malice clearly, the judge's use of "frame of mind" language in the charge defining malice was not prejudicial and did not create a substantial likelihood of a miscarriage of justice. [621-622]

At a murder trial, the judge's failure to instruct on the subjective component of third prong malice was error; however, where the jury convicted the defendant of murder in the first degree by reason of deliberate premeditation, any error in the third prong instruction was irrelevant [622-623]; moreover, given the strength of the Commonwealth's case, there was no substantial likelihood of a miscarriage of justice [623].

At a murder trial, no substantial likelihood of a miscarriage of justice was created by the judge's instructions on extreme atrocity or cruelty. [623]

At a murder trial in which, after the original panel of jurors had been sworn and the indictments read, the judge excused two jurors, empanelled three additional jurors, who were sworn, and the indictments were read again, no event occurred that terminated the original jeopardy and thus the defendant was not twice placed in jeopardy by the empanelling of the additional jurors [624-625]; moreover, in the circumstances, where defense counsel approved of the procedure and no prejudice was demonstrated, no defect of constitutional dimension was created [625].

At the trial of a criminal case, the judge should have inquired into the issue of juror bias when he was timely notified by defense counsel of that possibility; the defendant, however, demonstrated no prejudice from the error and did not show that the jurors were subjected to any extraneous influence. [625-628]

INDICTMENT found and returned in the Superior Court Department on April 2, 1993.

The case was tried before *William H. Welch,* J.

*Steven J. Rappaport* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

FRIED, J. The defendant was convicted of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty.[1] He sought to persuade the jury that he acted either in self-defense or at least out of fear of the victim, and he complains that, among other errors at trial, errors in the trial judge's charge prevented the jury from properly considering those claims. We affirm the conviction and decline to exercise our authority under G. L. c. 278, § 33E, to order a new trial or reduce the degree of guilt.

## I

The defendant, Johnson, and the victim, Charles Malone, had been friends until some five months prior to the killing. The rupture came about in October, 1992, when Malone accused Johnson of cheating him in a drug transaction and beat Johnson severely with a baseball bat. Johnson initially reported the assault to the police but eventually told Malone he would not press charges or testify if Malone paid him $3,000. It appears that Malone did give Johnson $1,000, and on the night of the killing they may have had discussions about payment of the balance. A Springfield police officer, Philip Tarpey, testified that prior to the killing Johnson had told him about this arrangement, that he had said he wanted revenge against Malone, that he had said that he should kill Malone but did not want to go to jail, and that he gave the officer information about Malone's drug organization in order to send Malone to jail.

The killing occurred in the early morning hours of March 13, 1993. Two witnesses who were with Malone just before the killing testified that as they walked toward a bar, Johnson emerged from between two parked cars. The witnesses testified that, when Johnson first confronted Malone as he approached the bar, Johnson said, "Hey, Chuckie" (Malone's nickname), and "What's up?" Johnson then raised and pointed a handgun at Malone and pulled the trigger, but the gun did not fire. Malone started backing up, with his hands up. Johnson apparently

---

[1] Two other indictments charging assault and battery by means of a dangerous weapon and illegal possession of a firearm were nol prossed before the case went to the jury.

adjusted the gun and attempted to fire it again. When it failed to fire the second time, Malone turned and ran. Johnson shot him in the back and Malone fell some twenty-five or thirty feet from where the initial encounter had taken place. Johnson went up to him as he lay face up in the street and Malone said, "All right, George. You got me. Stop. That . . . hurts." Johnson then stood over him and shot him two more times. Malone kept repeating the words "J.R." (Johnson's nickname) as he lay dying.

A correction officer testified that he was just arriving at the bar when he heard shots. Before the first shot he heard the assailant say, "Remember me," and "Remember me, Chuckie." Then, after the first shot, he saw a man standing over Malone shoot him twice and heard the man say, "You can't run. You can't run now." The locations of three spent shell casings from a .38 caliber semi-automatic weapon were consistent with this version of the events: one was found near the bar where the defendant fired the first shot and two were found farther up the street near where the victim fell.

Johnson testified to the beating he had received from Malone, that Malone continued to threaten and harass him, and that he was afraid that Malone would kill him. Officer Tarpey testified that Johnson had sought to obtain a protective order against Malone, and several witnesses testified that after the beating Johnson was terrified and preoccupied with the menace he felt from Malone. Dr. Alan Brown, a psychologist testifying on Johnson's behalf, gave his opinion that Johnson was suffering from posttraumatic stress disorder as a result of the beating. The defendant testified that he went to the bar outside which the encounter took place to attend a family party, even though he knew that Malone and his friends often went there. In the defendant's version of the events, Malone was outside the bar with some friends as Johnson arrived. He heard Malone say to his friends, "There go that nigger." The defendant tried to hide, heard one of Malone's friends say, "Let's get him," and he ran. One of Malone's friends was behind him and Malone was in front of him. This caused him to panic as he remembered the beating. "I just panicked. That's when everything happened." On cross-examination Johnson testified that he shot Malone, who was in front of him but coming toward him. His testimony was that he panicked and shot wildly. He denied remembering speaking any of the words the witnesses attributed to him, nor did he recall walking up to Malone and shooting him as he lay on the ground.

The defendant was convicted on June 27, 1994, and sentenced to life in prison. After the defendant's appeal was docketed in this court, the defendant filed a petition for relief pursuant to G. L. c. 278, § 33E, requesting a stay of proceedings and a remand to the Superior Court for postconviction interviews of certain jurors. A single justice remanded for a hearing on the defendant's allegations of extraneous influence on the jurors, and a hearing was held on July 23, 1996. Thereafter, the Superior Court judge issued a memorandum of decision on the order of remand, finding that the jurors were impartial and not subjected to extraneous influence. The defendant then pursued his appeal here.

## II

### A

Given Johnson's version of the shooting it was important to his defense that the jury receive a favorable instruction on self-defense or at least that they receive an instruction that allowed them to relieve him of full responsibility for the killing, reducing his culpability to that for voluntary manslaughter, on the ground that he was acting in a state of panic induced by the fear that he would again be attacked as he had been some months before.

Johnson complains that the charge regarding self-defense was defective in that it failed to make clear that the prosecution has the burden of showing that the defendant did not act in self-defense. It is undoubtedly true that "when the issue of self-defense is properly before the trier of fact, the Commonwealth must, as a matter of due process, prove beyond a reasonable doubt that the defendant did not act in self-defense" (footnote omitted). *Commonwealth* v. *Rodriguez*, 370 Mass. 684, 687-688 (1976). The charge defined self-defense correctly, but in defining it the judge did not there state the Commonwealth's burden of proof. It would have been better if he had, but the defendant, although he requested an instruction that made this clear, did not object to the charge as given. What the judge did do is explain, in connection with the charge on voluntary manslaughter, that the Commonwealth had the burden of proving that the force used by the defendant in the circumstances was excessive, so that if "the defendant uses excessive force . . . or the defendant himself becomes the attacker or the aggressor . . .

then that would constitute manslaughter." It was precisely the Commonwealth's contention that Johnson was the attacker or aggressor, and the charge made clear that it was the Commonwealth's burden to prove that. Similarly, in defining the elements of murder the judge made clear that the Commonwealth had the burden of proving that the killing was unlawful, and that that meant without lawful excuse or justification "as in the case of self-defense." Reading the instructions as a whole, as we are bound to do, *Commonwealth* v. *Beauchamp*, 424 Mass. 682, 686 (1997), we conclude that there was no substantial likelihood of a miscarriage of justice in this regard. We take into consideration that several witnesses testified that after the initial shot they saw Johnson stand over the victim and fire two more bullets into him, and that the only testimony that supports self-defense in this encounter was the defendant's own. He does not deny the killing, but only stated that he could not recall committing it.

A somewhat more plausible claim is that the defendant acted in the heat of passion and thus that he was guilty of no more than voluntary manslaughter. The judge explained that this lesser charge was an accommodation by the law to "the frailty of human nature." The defendant now complains that the charge did not adequately make clear that the Commonwealth has the burden of disproving that the defendant killed in the heat of passion on reasonable provocation. See *Commonwealth* v. *Richards*, 384 Mass. 396, 405 (1981). But the judge twice stated in his charge that the Commonwealth has the burden of proving beyond a reasonable doubt that the defendant did not act in the heat of passion or on sudden provocation. Once again, the defendant did not object to these instructions, and viewing them as a whole we see nothing approaching a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *McLeod*, 394 Mass. 727, 739-740, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985).

### B

The jury convicted the defendant of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty. The defendant raises several challenges to the judge's charge on malice.

The defendant first complains that the charge defining malice was defective in that it contained the "frame of mind" language

we disapproved of in *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). As we explained in *Eagles*, this language is unhelpful because it "may lead the jury to believe that anger, hatred, revenge or a selfish, wrongful mood is enough to show malice." *Id.* As in *Eagles*, however, here the extraneous frame of mind comments did not create a substantial likelihood of a miscarriage of justice. See *id.* at 837. See also *Commonwealth* v. *Morgan*, 422 Mass. 373, 382 (1996) (frame of mind language did not create a substantial likelihood of a miscarriage of justice). The defendant shot the victim three times, twice at close range while the victim lay helpless on the street. There can be little doubt about the defendant's intent to kill Malone. Given this evidence, and that the judge's instructions read as a whole explained malice clearly, the use of frame of mind language was not prejudicial.

Johnson next argues that the judge's definition of the third prong of malice referred only to the proof of an act that a reasonably prudent person would have known would cause death to follow, and did not mention that the jury must apply this standard in consideration of "the nature and extent of the defendant's knowledge of the circumstances at the time he acted." *Commonwealth* v. *Mello*, 420 Mass. 375, 389-390 (1995).[2] Eliminating the subjective component of third prong malice was clear error. *Id. Commonwealth* v. *Sama*, 411 Mass. 293, 298 (1991). It was not prejudicial, however. Error in a second or third prong instruction is not prejudicial where the jury convicts by reason of deliberate premeditation, because deliberate premeditation necessarily requires the jury to find a specific intent to kill, which satisfies the first prong of malice. See *Commonwealth* v. *Richardson*, 425 Mass. 765, 768 (1997); *Commonwealth* v. *Waite*, 422 Mass. 792, 804-805 (1996); *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995) ("any error in the instructions on the third prong of malice is irrelevant to a conviction of murder in the first degree on theories of felony-murder and deliberate premeditation"); *Commonwealth* v. *Costa*, 414 Mass. 618, 627 (1993). The jury found first prong malice beyond a reasonable doubt and under proper instruction, and therefore we can logically assume that both convictions, for

---

[2]The judge stated that malice "does not require any foresight by a defendant of the likely consequences of his or her act if objectively a reasonably prudent person would have known of the plain and strong likelihood that death would follow the contemplated act."

deliberate premeditation and extreme atrocity or cruelty, were based on a proper malice determination.

Moreover, because there was no objection, we ask if there was a substantial likelihood of a miscarriage of justice and, given the strength of the Commonwealth's case, we conclude that there was not. The defendant shot his victim three times, twice after he had fallen and was lying helpless in the street. There can be no doubt that the defendant subjectively understood that a plain and strong likelihood of death would result from his actions. After initially firing one shot at the victim the defendant took two steps away from Malone and then turned around and walked approximately twenty to thirty feet to where Malone lay wounded. As he stood over the victim, the defendant said, "You can't run now," and fired two additional bullets at close range. Given these facts, there can be no substantial likelihood of a miscarriage of justice in failing to insist that the jury evaluate that action in light of "the nature and extent of the defendant's knowledge of the circumstances at the time he acted." *Commonwealth* v. *Mello, supra* at 389-390.

Nor does the complaint that the charge on extreme atrocity or cruelty was unduly vague fare any better. In this case, as in *Commonwealth* v. *Semedo*, 422 Mass. 716, 725 (1996), and *Commonwealth* v. *Hunter*, 416 Mass. 831, 836 (1994), the trial judge instructed the jury to treat the factors from *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), as merely illustrative and said that "extreme atrocity or cruelty is not limited to cases with this evidence." We have made it quite clear that this is error, *Commonwealth* v. *Hunter, supra* at 836-837, but have also made clear that where the defendant did not object to the charge we will only consider the point if in the circumstances of the case there was a substantial likelihood of a miscarriage of justice on this score. See *Commonwealth* v. *Rosa*, 422 Mass. 18, 30-31 (1996). There was not. The judge's instructions went on to say that the jury should decide "based on the factors that I have indicated." See *Commonwealth* v. *Trapp*, 423 Mass. 356, 361, cert. denied, 519 U.S. 1045 (1996). There is no question that the defendant shot the victim three times, twice standing over him as he lay wounded in the street. There was evidence that he fired those last two shots while the victim was expressing pain and pleading for his life. In view of this evidence, there is no substantial likelihood that the jury did not base their verdict on at least one of the *Cunneen* factors.

## III

The defendant makes two arguments regarding the empanelling and constitution of the jury. First, he complains that after the original panel of jurors had been sworn and the indictments read, the judge excused two jurors and empanelled three additional jurors: these jurors were sworn and the indictments were again read. Although the defendant's trial counsel approved of this procedure at trial, his appellate counsel now claims that it was constitutionally defective as violating the double jeopardy clause of the Fifth Amendment to the United States Constitution, so much so that even the trial counsel's specific approval of it will not supply a cure.[3] We have approved this procedure, even over a defendant's objection, in *Commonwealth* v. *Monahan*, 349 Mass. 139, 158-60 (1965), although in that case the indictments had not been read before the additional juror was sworn and a certificate of protracted trial was filed.[4]

In a jury trial, jeopardy attaches when a jury are empanelled and sworn. See *Richardson* v. *United States*, 468 U.S. 317, 325 (1984); *Serfass* v. *United States*, 420 U.S. 377, 388 (1975); *Lovett* v. *Commonwealth*, 393 Mass. 444, 447 (1984). The double jeopardy clause protects a defendant's financial and emotional interests in having his trial concluded in a single proceeding, *Arizona* v. *Washington*, 434 U.S. 497, 503-504 (1978), as well as his interest in retaining a chosen jury. See *Crist* v. *Bretz*, 437 U.S. 28, 35 (1978). Here, although the original jury was sworn and seated and the indictments had been read, the empanelling of additional jurors did not violate

[3]The Fifth Amendment states, in part, "[N]or shall any person be subject for the same offence to be twice put in jeopardy." Although we have never "explicitly stated that our Declaration of Rights includes a double jeopardy guarantee . . . protection against double jeopardy in this Commonwealth has long been part of the common law" (citation omitted). *Lydon* v. *Commonwealth*, 381 Mass. 356, 366, cert. denied, 449 U.S. 1065 (1980). See *Collins* v. *Commonwealth*, 412 Mass. 349, 352 (1992); *Commonwealth* v. *Burke*, 342 Mass. 144, 145-146 (1961). As a statement of this common law principle, G. L. c. 263, § 7, prohibits prosecution of a defendant for the "same crime" twice.

[4]Although the defendant makes much of the judge's failure to file a certificate of protracted trial, G. L. c. 234, § 26B, permits a judge to empanel up to sixteen jurors if a trial, "in the opinion of the court, is likely to be protracted." In 1979, the Legislature removed the obligation so to certify. See St. 1979, c. 344, § 9A (deleting "may so certify" from the first sentence of the first paragraph of § 26B).

the defendant's rights. As the United States Supreme Court has said, "the protection of the Double Jeopardy Clause by its terms applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." *Richardson* v. *United States, supra* at 325. As no constitutionally significant event occurred between the time that the judge empanelled the original jurors and the empanelment of alternate jurors the next morning, the original jeopardy was never terminated, and thus the defendant was not twice placed in jeopardy. See *United States* v. *Isom,* 88 F.3d 920, 922 (11th Cir. 1996), cert. denied, 117 S. Ct. 1325 (1997) (finding no double jeopardy violation where jurors were sworn and seated and then on the following court day the judge empanelled alternate jurors); *United States* v. *Trigg,* 988 F.2d 1008, 1009-1010 (9th Cir. 1993) (finding no event terminating the original jeopardy in identical circumstances).

Although the defendant now urges that the judge could have ordered a mistrial had he felt the need to empanel more than twelve jurors, where jeopardy has attached, mistrial, and the possibility of second jeopardy, must be used cautiously. See *Commonwealth* v. *Steward,* 396 Mass. 76, 79 (1985); *Commonwealth* v. *Phillips,* 12 Mass. App. Ct. 486 (1981). The defendant not only failed to raise this double jeopardy claim below, despite the judge granting a recess at the prosecution's request so that the office of the district attorney could investigate whether as a matter of law empanelling the additional jurors was permissible, but also affirmatively *approved* of the procedure used. When asked "is the defendant objecting to that procedure?," defense counsel stated, "No, your Honor. *We* approve of it," to which the judge responded, "Okay. I think it would be an issue if the defendant objected to it . . . In view of that, then I think we'll go ahead and empanel [additional jurors]." We fail to see how the circumstances of this case, particularly in light of defense counsel's approval and the obvious lack of prejudice, create a defect of constitutional dimensions.

Finally, the defendant complains about the presence on the jury of juror W. On the second day of empanelment, the prosecutor indicated to the judge that he had received information that juror W might be acquainted with the victim or his family. The judge inquired of her on that score and she said that she did not know the victim or his family personally or in her

employment, and that she could serve as "an open minded, impartial juror." The judge found that the juror could remain impartial and was properly seated.[5] Defense counsel then indicated to the judge that he had information that the juror's husband had attended Malone's wake, but the judge declined to inquire of the juror if that was so in light of her answers to his more general inquiry. The defendant sought to challenge the juror, but the judge declined based on the juror's statement that she could be impartial. A short time later, juror W came forward and indicated to the judge that she recognized, but did not know, a woman sitting in the courtroom. The woman was related to the victim and was a witness for the Commonwealth. The judge inquired of juror W's relations with or knowledge of the woman, and the juror stated that she merely recognized the woman and that her ability to be impartial would not be affected.

On appeal, the defendant makes much of the fact that the judge refused to ask juror W whether her husband attended the victim's wake and refused to allow him to challenge the juror because the jury had already been sworn and seated. The defendant argues that Mass. R. Crim. P. 20, 378 Mass. 889 (1978), gives a trial judge the discretion, which the judge here declined to exercise, to allow a peremptory challenge after the juror has been seated, and that the failure to exercise that discretion is an error that requires a new trial. The defendant's reading of rule 20 is incorrect. Rule 20 (c) (2) explicitly states that a peremptory challenge "shall be made before the jurors are sworn." *Id.* at 891. The defendant points to the next clause of the rule which states, "and may be made after the determination

[5]Johnson contends that he had a right to be included at the judge's individual voir dire of juror W, and that his attorney's presence and acquiescence alone cannot suffice. A defendant is entitled to be present at all critical stages of a criminal proceeding, including voir dire of an individual juror, if "an appropriate request for his presence is made." *Commonwealth* v. *Owens*, 414 Mass. 595, 602 (1993), quoting *Amado* v. *Commonwealth*, 349 Mass. 716, 721 (1965). The defendant made no such request in this case, the judge never "excluded" him, and his counsel never objected to the defendant's absence. In such circumstances, we "consider[] the issue waived and will not address it on appeal." *Id.* at 605. Moreover, even had the defendant requested to be present, any error on this score was harmless beyond a reasonable doubt. As explained *infra*, postconviction proceedings regarding the impartiality of juror W were conducted at the defendant's request and by order of this court. The defendant was personally present at those proceedings, and they cured any earlier defect.

that a person called to serve as a juror stands indifferent in the case," as indicating that the judge has discretion to allow a peremptory challenge after the juror has been sworn. That is not a correct reading of the rule. See K.B. Smith, Criminal Practice and Procedure § 1726 (2d ed. 1983). What the second clause states is that, if the juror has not yet been sworn, then there may be a peremptory challenge even after there has been a determination of that juror's indifference. The defendant offers no authority for his reading of the rule, and the one case he offers as helpful says just the opposite. See *Commonwealth* v. *Gagliardi*, 29 Mass. App. Ct. 225, 236-237 (1990), *S.C.*, 418 Mass. 562 (1994), cert. denied, 513 U.S. 1091 (1995).

There remains then only the question whether the judge should have inquired of the juror whether her husband had indeed attended Malone's wake and should have made his decision that she should be seated in light of the answer to that question. Given the defense counsel's timely notification of the judge about the possibility of bias, the judge should have inquired specifically about the wake and the juror's, or juror's spouse's, attendance. See G. L. c. 234, § 28 ("if it appears that . . . the juror may not stand indifferent, the court *shall* . . . examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may . . . cause a decision . . . to be made in whole or in part upon issues extraneous to the issues in the case" [emphasis added]).

The error, however, was not prejudicial. See *Commonwealth* v. *Otsuki*, 411 Mass. 218, 228 (1991) (defendant must show that the judge's failure to hold an individual voir dire prejudiced his case). The defendant sought postconviction relief from a single justice of this court on this issue, and the matter was remanded for further proceedings to determine whether any jurors were subject to extraneous influences at trial. In the remand proceedings on July 23, 1996, the judge recalled juror W and a second juror.[6] At the defendant's urging, the judge specifically asked juror W whether her husband attended the funeral or the wake of the victim. Juror W stated, "Not that I know of. I don't know . . . I don't know if he did or didn't." The judge asked a long series of other questions to probe whether the juror knew the defendant, the victim, or their immediate families, and concluded, in a memorandum of decision dated September 30,

---

[6]On appeal, the defendant raises no challenge regarding the second juror.

1996, that, "[b]ased on all the evidence, I do not find either juror dishonestly answered a material question or that any prejudice resulted to the Defendant. I find the jurors were not biased for or against the Defendant and decided the case impartially and fairly on the evidence as instructed by the court."

On appeal, the defendant raises no challenge to the conclusion reached by the judge at the remand proceedings ordered by this court. In his brief to us, the defendant states that he "is compelled to concede that the defendant did not demonstrate actual prejudice with regard to [the juror] during [the remand] proceeding." Although the juror's husband may, indeed, have attended the victim's wake, she testified that she did not know of his attendance, and the judge found that her participation was not infected by extraneous influence. It is, after all, the juror's bias we are concerned about. Her husband's relation to the victim is relevant only as it bears on that question. Thus, the defendant's claim must be limited to the rather formal question whether the *original* failure to inquire *at trial* constituted error requiring a new trial, regardless of the postconviction cure ordered by the single justice. We reject that claim. The defendant has failed to show that he suffered prejudice or that the jurors in this case were subjected to extraneous influences.

IV

Having reviewed the record as a whole we find no reason to exercise our authority under G. L. c. 278, § 33E, to order a new trial or to alter the verdict.

*Judgment affirmed.*